## Powell *versus* Commonwealth.

1. Nothing but a clear violation of the Constitution—a clear usurpation of power prohibited—will justify the judicial department in pronouncing an Act of the legislative department unconstitutional and void.

2. The constitutionality of an Act of Assembly cannot be tried by the motives and designs of the law makers however plainly expressed. If the Act itself is within the scope of their authority it must stand.

3. The Act of May 21st, 1885, P. L., 22, prohibiting the manufacture, and sale of oleomargarine, or the keeping the same with intent to sell, falls within the police power of the state, which may be described to be the power vested in the legislature by the constitution to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth and the people of the same.

4. The test of the reasonableness of a police regulation prohibiting the making and vending of a particular article of food, is not alone whether it is in part unwholesome and injurious. If an article of food is of such a character that few persons will eat it knowing its real character; if at the same time it is of such a nature that it can be imposed upon the public as an article of food which is in common use, and against which there is no prejudice; and if, in addition to this, there is probable ground for believing that the only way to prevent the public from being defrauded into purchasing the counterfeit article for the genuine is to prohibit altogether the manufacture and sale of the former, then such a prohibition may stand as a reasonable police regulation, although the article prohibited is in fact innocuous, and although its production might be found beneficial to the public, if in buying it they could distinguish it from the production of which it is the imitation.

5. The fact that scientific experts may pronounce a manufactured article intended for human food to be wholesome and not injurious, and that in a pure state it may be thus good for food, does not render it incompetent for the legislature to prohibit the manufacture and sale of the article if in the judgment of the legislature, and not of the courts, it be necessary to the protection of the lives, health and property of the citizens, and to the preservation of good order and the public morals.

6. The Act of May 21st, 1885, is not in conflict with Amendment XIV. of the Constitution of the United States.

June 2d, 1886.    Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ.

Error to the Court of Quarter Sessions of the Peace of *Dauphin county :* Of May Term 1886, No 16.

On July 10th, 1885, W. L. Powell, a merchant of the city of Harrisburg, was arrested for a violation of the Act of 21st May, 1885, P. L., 1885, p. 22, entitled " An act for the protection of the public health, and to prevent adulteration of dairy products, and fraud in the sale thereof."

The following is the first section of said Act:

Section 1. That no person, firm, or corporate body, shall manufacture out of any oleaginous substance, or any compound of the same other than that produced from unadulterated milk, or of cream from the same, any article designed to take the place of butter or cheese produced from pure unadulterated milk, or cream from the same, or of any imitation or adulterated butter or cheese, nor shall sell, or offer for sale, or have in his, her, or their possession, with intent to sell the same as an article of food.

The remaining sections of the Act imposes penalties and provides for the enforcement of it.

At the August session of the Court of Quarter Sessions of the Peace of Dauphin county, an indictment was found against him, charging him in two counts with " selling imitation butter," and with " having imitation butter with intent to sell the same."

On 11th of September, 1885, a trial was had, and the following agreement was made : That the defendant had sold, on the 10th day of July, 1885, as an article of food, two original packages " containing an article manufactured out of oleaginous substances and compounds other than that produced from unadulterated milk, or cream from the same, and designed to take the place of butter produced from pure unadulterated milk, or cream; that said packages were sold and bought as butterine, and not as butter produced from pure unadulterated milk or cream from the same. It is further agreed that the said defendant had in his possession, with intent to sell the same as an article of food, one hundred other pounds of said article. It is further agreed that the packages so sold to the prosecutor and now produced in court, containing twenty-three pounds each, and that each package was then, and is now, marked with the words ' oleomargarine butter ' upon the lid and side of the package, in a straight line, in Roman letters half an inch long."

The commonwealth then rested.

The defendant then proposed to prove, by Prof. Hugo Blanck, " that he saw the article sold to the prosecuting witness manufactured; that it was made from pure animal fats; that the process of manufacture was clean and wholesome;

that the article contains the same elements as dairy butter; that the only difference between them is that the manufactured contains a smaller proportion of the fatty substance known as butterine; that this butterine exists in dairy butter in the proportion of from three to seven per cent., and in the manufactured article in a smaller proportion, and was increased in the manufactured article by the introduction of milk and cream; that this having been done, the article contains all the elements of butter produced from pure unadulterated milk, or cream from the same, except that the percentage of butterine is slightly smaller; that the only effect of butterine is to give flavor to the butter, and has nothing to do with its wholesomeness; that the oleaginous substances in the manufactured article are substantially identical with those produced from milk or cream; that the article sold by the defendant to the prosecuting witness was a wholesome and nutritious article of food, and in all respects as wholesome and healthful as butter produced from pure unadulterated milk, or cream from the same."

The commonwealth objected to the reception of this evidence upon the ground that it was immaterial and irrelevant to the issue.

The court sustained the objection, and the evidence was excluded. (First assignment of error.)

The defendant then offered to prove " that he is engaged in the grocery and provision business in the city of Harrisburg, and that the article sold by him was part of a large and valuable quantity manufactured prior to the 21st of May, 1885, in accordance with the laws of this Commonwealth relative to the manufacture and sale of said article, and so sold by him; and that for the manufacture of said article large investments were made in the purchase of suitable real estate, the erection of proper buildings, and the purchase of the necessary machinery and ingredients; that in his traffic in the said article the defendant made large profits, and that if the said defendant should be prevented from trafficking in said article the value of his property engaged therein would be entirely lost, and he would be deprived of the means of livelihood."

Upon objection by the commonwealth, the court overruled this offer of testimony, and noted an exception for the defendant. (Second assignment of error.)

The defendant then rested, and the court gave the following charge to the jury:

" Gentlemen of the jury:—As the record now stands, the commission of the offense charged in the indictment is admitted, and it is, therefore, your duty to render a verdict of guilty."

An exception to the charge was noted in favor of the de-

fendant. (Third assignment of error.) The verdict of the jury was that the defendant was guilty in manner and form as he was indicted.

The defendant moved in arrest of judgment and for a new trial, and submitted the following reasons:

1. The Act of Assembly of 21st May, 1885, entitled "An act for the protection of the public health, and to prevent adulteration of dairy products, and fraud in the sale thereof," which is the Act of Assembly under which this prosecution was commenced, is in violation of the provisions of section 1, of article 1, of the Constitution of the Commonwealth of Pennsylvania.

2. It is an unjust and unlawful interference with, and infringement of, the personal rights of property, business, industry, and liberty of the Commonwealth of Pennsylvania.

3. The said Act of Assembly is unconstitutional and void, because it destroys property without making or providing any compensation therefor.

4. The said Act of Assembly is not a constitutional and legal exercise of the police power belonging to the state, but is a deprivation of the property of the citizen without compensation.

5. The said Act of Assembly is intended to, and actually does, deprive the defendant and other citizens of the state of Pennsylvania, who have made similar investments, and engaged in similar business, of their property, without compensation, and without any legal reason for such deprivation.

6. The court erred, it is submitted with great respect, in rejecting the testimony offered by the defendants to show that the substance which he sold was a wholesome and proper article for food, and was not an adulteration of any dairy product, or manufactured or sold in fraud or imitation thereof.

7. The court erred, it is again submitted with great respect, in not instructing the jury that, under the law and facts of this case, the defendant had committed no offense, and was entitled to a verdict of acquittal.

The court, SIMONTON, P. J., on December 5th, 1885, filed the following opinion, overruling the motion for a new trial and in arrest of judgment, and giving the commonwealth liberty to move for judgment upon the verdict. (Fourth assignment of error.)

The defendant, who is engaged in the grocery and provision business in the city of Harrisburg, was tried in the court of Quarter Sessions of Dauphin county on an indictment based upon the Act of May 21st, 1885, the first section of which is as follows: "No person, firm, or corporate body shall manufacture out of any oleaginous substance, or any compound of

[Powell *v.* Commonwealth.]

the same other than that produced from unadulterated milk, or of cream from the same, any article designed to take the place of butter or cheese produced from pure unadulterated milk, or cream from the same, or (of) any imitation or adulterated butter or cheese, nor sell, or offer for sale, or have in his possession with intent to sell the same, as an article of food." The fourth section makes it a criminal misdemeanor to violate the provisions of the first section.

The offense charged was the selling, and having in his possession with intent to sell, the article the manufacture and sale of which is prohibited by the Act.

The following agreement was, at the trial, put in evidence by the Commonwealth: "It is agreed, for the purposes of this trial, that the defendant sold to the prosecuting witness, in the city of Harrisburg, July 10th, 1885, as an article of food, two original packages, *pro ut* the said packages here produced in court, containing an article manufactured out of an oleaginous substance and compound other than that produced from unadulterated milk, or cream from the same, and designed to take the place of butter produced from pure unadulterated milk, or cream; that said packages were sold and bought as butterine, and not as butter produced from pure unadulterated milk, or cream from the same.

"It is further agreed that said defendant had in his possession, with intent to sell the same as an article of food, one hundred other pounds of said article.

"It is further agreed that the packages so sold to the prosecutor, and as now produced in court, contain twenty-three pounds each, and that each package was then, and is now, marked with the words 'oleomargarine butter' upon the lid and side of the package in a straight line in Roman letters half an inch long." Whereupon the Commonwealth rested.

The defendant then produced an expert witness, and offered to prove by him certain matters, which, on objection by the District Attorney, were excluded by the court.

These offers will be quoted at length hereafter in this opinion.

The case was then submitted to the jury, on the admission contained in the agreement in evidence, and a verdict of guilty was rendered.

Motions were then made, on behalf of the defendant, for a new trial, and in arrest of judgment, which were fully and ably argued and are now to be decided.

The able counsel for the defendant contended at the trial, and on the argument of these motions—

1. That the act under which defendant was indicted and convicted is unconstitutional *per se;* and

[Powell *v.* Commonwealth.]

2. That the evidence offered and rejected was relevant to the question of its constitutionality as applied to the special facts of this case.

We must determine whether either or both of these positions can be maintained.

It results from the very nature of the case that when the question properly arises, and a statute is found by the courts to be unconstitutional, they must declare it void.

The Constitution of the United States is the supreme law of the land, and next to it, and higher in authority than legislative statutes, is the Constitution of the State.

Hence, when a statute come in conflict with either, it must give way, and the courts must decide whether such conflict exists or not, when the rights of parties litigant depend upon such decision.

"Courts are organized and established to administer the laws of the land. In their decision they are bound to preserve and protect those paramount laws which they are sworn to support": Flint River Steamboat Company *v.* Foster, 5 Ga., 194; (48 Am. Dec., p. 256.)

But, as is shown by Chief Justice BLACK in Sharpless *v.* The Mayor, 9 H., 147, a statute will be declared void by the court "only when it violates the Constitution clearly, palpably, plainly and in such manner as to leave no doubt or hesitation on our minds." And he adds that this is a rule which "has the singular advantage of not being opposed even by a dictum." Again, in Erie and North-East Railroad Company *v.* Casey, 26 Pa. St., 287, the same judge says: "The right of the judiciary to declare a statute void, and to arrest its execution, is one which, in the opinion of all courts, is coupled with responsibilities so grave that it is never to be exercised except in very clear cases; one department of the Government is bound to presume that another has acted rightly. The party who wishes us to pronounce a law unconstitutional takes upon himself the burden of proving, beyond a doubt, that it is so."

And in the opinion of the court, in Pennsylvania Railroad Company *v.* Riblet, 66 Pa. St., 164, Chief Justice SHARSWOOD says: "Nothing but a clear violation of the Constitution—a clear usurpation of power prohibited—will justify the judicial department in pronouncing an Act of the legislative department unconstitutional and void." And the courts cannot inquire whether the legislature has violated the general principles of liberty, or whether its enactments are unwise or inexpedient, but only whether it has overstepped the limits prescribed for it in the Constitution.

This is declared by Chief Justice BLACK in the clearest and

[Powell v. Commonwealth.]

most forcible language, in Sharpless v. The Mayor, supra, thus:
"To me, it is as plain that the General Assembly may exercise all the powers which are properly legislative, and which are not taken away by our own, or by the federal Constitution, as it is that the people have all the rights which are expressly reserved. We are urged, however, to go further than this, and to hold that a law, though not prohibited, is void if it violates the spirit of our institutions, or impairs any of those rights which it is the object of a free government to protect, and to declare it unconstitutional if it be wrong and unjust. But we cannot do this." And he proceeds to show, by reference to numerous authorities, that, as he says, "the weight of authority is overwhelming" in support of the doctrine thus laid down. And in the latter case of Commonwealth v. Maxwell, 3 Casey, 456, Chief Justice WOODWARD said: "A law that is unconstitutional is so because it is either an assumption of power not legislative in its nature, or because it is inconsistent with some provision of the federal or state Constitution."

We could cite numerous cases to show that the same doctrine is held by the highest courts of all the states, but we do not deem it necessary so to do. We have abundantly shown that it is the doctrine by which we must be governed in deciding this case. We will endeavor, first, to determine whether the act is unconstitutional, per se, irrespective of the evidence offered and excluded.

The burden of proof is, as we have seen, on the defendant. We have carefully considered the suggestions and arguments advanced by his able counsel, intended to show that the power to enact a statute, such as the one in question, which, as they contend, deprives the defendant of the use of his faculties, and takes from him a means of livelihood, is excepted out of the general grant of the legislative power contained in the Constitution, by the express or implied limitations or prohibitions of the bill of rights or the body of the Constitution itself.

But assuming for the present that the statute is in its nature legislative, we are wholly unable to find any limitation or prohibition which can be successfully pleaded against its enactment or enforcement. For whilst the bill of rights does declare that "all men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying life and liberty, and of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness," this has never been construed to be a declaration that these rights are absolute.

On the contrary, as is said by Chief Justice SHAW, in Commonwealth v. Alger, 7 Cushing, 53: "We think it a set-

tled principle, growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified his title may be, holds it under the implied liability that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property . . . . . is held subject to those general regulations which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient."

Hence, if the Act in question be legislative in its character, the limitations which it prescribes for the defendant in the acquisition, possession, and use of his property, are clearly within the boundary lines drawn by the Constitution, if, in the judgment of the legislature, these limitations are considered necessary and expedient for the welfare of the community. And, if so, then in so far as they do, if at all, interfere with the defendant's full enjoyment of his property, this interference results from the "law of the land."

It has not been even suggested in argument that the statute is in conflict with any of the provisions of the Constitution of the United States, and hence we need not refer to that instrument, except to say that, if it were so suggested, we think the contrary is clearly shown by Mr. Justice MILLER, In Re Broswaken, 18 Fed. Rep., 62.

But counsel contend that this enactment is not properly legislative in its character, but that, under the guise of a pretended exercise of the police power of the state, the legislature has made an unwarranted attack upon private rights that, as stated by the learned counsel who closed the argument on behalf of the defendant, "in the form of government ordained by this people, and under which we live, the grant of legislative power never included a power for the destruction of a harmless industry, which is sought in this case to be exerted."

This brings us to the fundamental question in the case, namely, the question of the nature and the extent of the police power of the state.

This power is a proper subject for description rather than definition, and it has nowhere been more aptly described than by Chief Justice SHAW in Commonwealth *v.* Alger, *supra*, at page 85, where it is said to be " the power vested in the legislature by the Constitution, to make, ordain, and establish all manner of

[Powell v. Commonwealth.]

wholesale and reasonable laws, statutes, and ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the Commonwealth, and of the people of the same."

This power, as was said by Justice FIELD, in his concurring opinion in Barteme Iowa, 18 Wall., 138, extends to all regulations affecting health, good order, morals, peace, and safety of society under it all sorts of restrictions and burdens are imposed and when these are not in conflict with any constitutional prohibition or fundamental principles, they cannot be successfully assailed in a judicial tribunal."

We think the line between the valid exercise of this police power and the invasion of private rights is well drawn in the opinion of the court by EARL, J., in Jacobs' Case, 98 N. Y., 98, thus: "Generally it is for the legislature to determine what laws and regulations are needed to protect the public health and secure the public comfort and safety, and when its measures are calculated, intended, convenient, and appropriate to accomplish these ends, the exercise of its discretion is not subject to review by the courts. But they must have some relation to these ends. Under the mere guise of police regulations, personal rights and private property cannot be arbitrarily invaded, and the determination of the legislature is not final and conclusive. If it passes an Act ostensibly for the public health, and thereby destroys or takes away the property of a citizen and interferes with his personal liberty, then it is for the courts to scrutinize the Act and see whether it really relates to, and is convenient and appropriate to promote the public health. It matters not that the legislature may, in the title to the Act, or in its body, declare that it is intended for the improvement of the public health. Such a declaration does not conclude the courts, and they must yet determine the fact declared, and enforce the supreme law."

To the same effect is Commonwealth v. Bearse, 132 Mass., 542, where, speaking of the exercise of the police power, it is said: "The legislature is largely the judge of its own powers with reference to these matters. If it can be seen, indeed, that the rights of property are invaded under the pretense of a police regulation, it would be our duty to interfere to protect them." And in Pennsylvania Railroad Company v. Riblet, *supra*, the court say: "We cannot try the constitutionalty of a legislative Act by the motives and designs of the lawmakers, however plainly expressed. If the Act itself is within the scope of their authority it must stand, and we are bound to make it stand, if it will, upon any intendment." The point of contact between the power of the legislature and that of

4 AMERMAN—18

the courts, with respect to the exercise of the police power, may be illustrated by the decisions relating to the power of taxation. This power, when exercised in the mode prescribed by the Constitution, is practically unlimited, but the courts will always determine whether a so styled taxing Act is in reality such, and if it be not, as, for instance, if the purpose for which the tax is laid be a private and not a public purpose, the Act will be declared unconstitutional and void. This is the principle lying at the foundation of the decisions of the numerous cases which hold that taxation in aid of the construction of railroads is constitutional, among which Sharpless *v.* The Mayor, *supra*, is a leading case. The taxation is upheld because the building of railroads is deemed a matter of public interest. And whenever the courts have considered that the construction of railroads is not a public matter, they have held that laws authorizing taxation for such a purpose are not in reality tax laws, an instance of which is People *v.* Salem, 20 Mich., 452, decided by Mr. Justice COOLEY. See note to Sharpless *v.* Mayor, 59 Am. Dec., 782, citing a multitude of cases. See, also, cases relating to frontage rule of valuation of real estate, for assessment purposes: Washington Avenue, 19 P. F. S., 352; Seely *v.* City of Pittsburgh, 1 Norris, 360; Craig *v* City of Philadelphia, 8 Norris, 265; City of Philadelphia *v.* Rule, 12 Norris, 15.

Another illustration is furnished by the cases relating to the exercise by the legislature of the power of eminent domain. The legislature may condemn, or authorize the condemnation of private property for public use, and it may, in the exercise of its discretion, determine when and upon what property the power of eminent domain may be exercised; but its exercise is not beyond the reach of judicial inquiry. Whether or not a use is a public one which will justify the exercise of the power, is a judicial question. Although the legislature may daclare it to be public, that does not necessarily determine its character; it must in fact be public, and, if it be not so, no legislative fiat can make it so: Palairet's Appeal, 17 P. F. S., 488.

On these principles the Court of Appeals of New York, in Jacobs' Case, *supra*, decided the statute there in question to be unconstitutional. It was entitled "An Act to improve the public health by prohibiting the manufacture of segars and preparations of tobacco in any room in tenement houses in certain cases, and regulating the use of tenement houses in certain cases." It prohibited such manufacture in any tenement house occupied by more than three families, except on the first floor of houses on which there is a store for the sale of segars and tobacco. The court, on examining the nature

and scope of the Act, say: " It is plain that this is not a health law, and that it has no relation whatever to the public health ; " and, therefore, it is pronounced unconstitutional.    Had it been,. in reality, a health law, the decision would have been other-wise.    So, in People *v.* Marx, 1 East. Rep., 196, (32 App. L. J., 6,) where the defendant was indicted for a sale made in violation of the provisions of an Act entitled " An Act to pre-vent deception in the sale of dairy products," the body of which is substantially the same as that of the Act now before us, the court held the Act unconstitutional because they found that it was not a *bona fide* police regulation.    They say : " It appears to us quite clear that the object and effect of the en-actment under consideration was not to supplement the exist-ing provisions against fraud and deception by means of imitation of dairy butter, but to take a further and bolder step, and by absolutely, prohibiting the manufacture and sale of any article which could be used as a substitute for it, how-ever openly and fairly the character of the substitute might be averred and published, to drive the substituted articles from the market and protect those engaged in the manufacture of dairy products against the competition of cheaper substances capable of being applied to the same uses as articles of food."

" The learned counsel for the respondent frankly meets this view, and claims in his points, as he did orally upon the argu-ment, that even if it were certain that the sole object of the enactment was to protect the dairy industry in this state against the substitution of a cheaper article made from cheap-er materials, this would not be beyond the power of the legis-lature.    This, we think, is the real question presented in the case."

And, after referring to constitutional provisions and cases, the court adds : " Who will have the temerity to say that these constitutional principles are not violated by an enact-ment which absolutely prohibits an important branch of in-dustry for the sole reason that it competes with another, and may reduce the price of an article of food for the human race ? "

" Illustrations might be indefinitely multiplied of the evils which would result from legislation which should exclude one class of citizens from industries, lawful in other respects, in order to protect another class against competition.    We can-not doubt that such legislation is violation of the letter as well as the spirit of the constitutional provisions before referred to, nor that such is the character of the enactment under which the appellant was convicted."

This decision is manifestly correct, if we concede that the

purpose and intent of the act were those thus found and de
clared by the court.

And, if we could be satisfied that the object and intent of
the Act in question here were what the Court of Appeals of
New York declared the object and intent of the Act before
that court to be, we would not hesitate to pronounce it uncon-
stitutional and void. But having in mind the axiom that all
the presumptions are in favor of the good faith of a co-ordi-
nate department of the government, and that to doubt is to be
resolved in favor of the validity of its acts, how can we say
that it is not the *bona fide* purpose of this statute, as expressed
in its title, to protect the public health, and to prevent the
adulteration of dairy products and fraud in their sale? And
the legislature having, by passing the Act, declared its judg-
ment that the means used are necessary to attain these ends,
we cannot review this judgment, when exercised in good faith,
for the conclusive reason that it is clearly within the jurisdic-
tion of the legislature to effect these purposes by appropriate
means. "The fair presumption is that, in the honest judg-
ment of the law-making power, exercised in the light of past
legislation on the same subject, no less stringent enactment
would have sufficed."

In accord with this view is the State *v.* Addington, 12 Mo.
App. Rep., 214, affirmed in 77 Mo. R., 110. There a statute
substantially identical with ours was held to be a valid ex-
ercise of the police power of the state vested in the legisla-
ture. This ruling was based upon the conclusion that the
statute "was obviously passed in the form of a sweeping pro-
hibition, because the legislature were of opinion, after two
years' experience with the previous statute, that it was inef-
fectual to prevent our people from being defrauded by having
an artificial compound sold to them as real butter. The de-
sign of the manufacturer and seller may be perfectly honest,
but the person to whom they may sell the article"—the retail
dealer—"may be dishonest; and, therefore, the legislature
thought it best to lay the axe at the root of the tree by pro-
hibiting entirely the manufacture and sale of such compound
within the state."

The opinion delivered in this case in the intermediate court
by THOMPSON, J., is worthy of attentive perusal by reason of
its strength of reasoning and fullness of illustration and cita-
tion of authorities. We must content ourselves with a refer-
ence to a few only of the multitude of cases, in addition to
those already cited, which illustrate and confirm the principles
we have stated, and the conclusion we have reached. They
are as follows: Slaughter-house Cases, 36 Wall., 32, where
the court hold that "an Act to protect the health of the city

of New Orleans, etc.," which gave to a corporation the exclusive right to have all stock intended for slaughter landed at its stock-yard, and butchered at its slaughter-house, was constitutional, because it was passed in the exercise of the police power of the state.

Butchers' Union Company v. Crescent City Company, 111 U. S., 746, deciding that, although the Act upheld in the slaughter-house case just cited gave the corporation an exclusive right for twenty-five years by a valid contract, yet, in the exercise of the police power, the privilege of landing stock and maintaining a slaughter-house might, within that period, be granted also to another company. And see cases referred to in the opinion to show that the legislature cannot, by contract, divest itself of the right to exercise the police power where deemed necessary: Beer Company v. Massachusetts, 97 U. S., 25, in which it is decided affirming Bartemeyer v. Iowa, 18 Wall., 129, that a state law prohibiting the manufacture and sale of intoxicating liquors is not repugnant to any clause of the constitution of the United States, and that if the public safety or the public morals require the discontinuance of any manufacture or traffic, the legislature, in the exercise of the police power, may require its discontinuance even as against a corporation chartered for the express purpose of carrying it on.

Patterson v. Kentucky, 97 U. S., 501, where the same principle is applied to an Act forbidding the sale of an article for which a patent had been granted by the United States: Stone v. Mississippi, 101 U. S., 814, where the same principle was applied to the charter of a lottery company: Barbier v. Connelly, 113 U. S., 27, and Soon Hing v. Crowley, Id., 703, which hold that a municipal ordinance prohibiting washing and ironing in public laundries and wash-houses within certain hours is a valid exercise of the police power.

In the latter case, it is said: " The courts cannot inquire into the motive of the legislature in passing an Act, except as they may be disclosed on its face or inferable from its operation considered with reference to the condition of the country and existing legislation.

Blair v. Forehand, 100 Mass., 136, holding that an Act providing that any person might kill any dog not licensed and collared, as provided by the statute, whenever found, was a valid exercise of the police power: Bertholf v. O'Rielly, 74 N. Y., 509, (30 Am. R., 323), deciding, after a full discussion of the extent of the police power, that a statute enacting that the lessor of premises, with the knowledge that they are to be used for the sale of intoxicating liquors, shall be liable for

damage caused by the Act of one intoxicated by liquor sold there, is constitutional.

Woods *v.* State, 36 Ark., 36, (38 Am. R., 22), holding that under the statute forbidding the sale of ardent spirits by any person for any purpose without a license, a druggist cannot lawfully sell such spirits, even as medicine upon the prescription of a physician—citing numerous cases to show that the right of the legislature in the exercise of the police power of the state to regulate or prohibit the sale of intoxicating liquors has been settled by the courts beyond controversy.

State *v.* Mugler, 29 Kan., 252 (44 Am. R., 643), which holds that a law prohibiting the brewing and selling of beer, applied to beer lawfully manufactured before the law took effect but sold thereafter.

Davis *v.* State, 68 Ala., 58, (44 Am. R., 128), where it is decided that a statute declaring it unlawful, within certain counties, to transport or move after sunset and before sunrise any cotton in the seed, was constitutional.

Donnely *v.* Decker, 58 Wis., 461 (46 Am. R., 637), in which the court held that a law providing for the drainage of lands, whenever the town supervisors shall deem it conducive to public health, and for the payment of damages, and for the assessment of the whole cost on the lands benefited, was constitutional as an exercise of the police power.

Hawthorne *v.* People, 109 Ill., 302 (50 Am. R., 610), deciding that a law requiring operators of butter and cheese factories on the co-operative plan to give bonds for faithful accounting for property received for manufacture, is not unconstitutional.

Fry *v.* State, 63 Ind., 552 (30 Am. R., 238), holding constitutional a statute regulating the issue and sale of tickets by railroad companies.

State *v.* Ah Chew, 16 Nev., 50 (40 Am. R., 488), sustaining statute prohibiting the sale of opium.

Commonwealth *v.* Waite, 11 Allen, 264. This case decides that the legislature have the right, in the exercise of the police power, to make it a criminal offence to sell pure milk mixed with pure water.

Many of these cases, which are but a tithe of those pertinent to the subject, which might be cited, are fully and ably reasoned, and are supported by the citation of numerous authorities; taken together, they furnish a very instructive discussion and illustration of the nature, extent, and limitation of the police power of the state, and its relations to the federal and state constitutions.

Thus far we have considered the case as if the question were merely whether the statute is or is not constitutional *per se.*

[Powell v. Commonwealth.]

But the defendant offered to prove, at the trial, by an expert witness, "that he saw the article sold to the prosecuting witness manufactured; that it was made from pure animal fats; that the process of manufacture was clean and wholesome; that the article contains the same elements as dairy butter; that the only difference between them is that the manufactured article contains a smaller proportion of the fatty substance known as butterine; that this butterine exists in dairy butter in the proportion of from three to seven per cent., and in the manufactured article in a smaller proportion, and was increased in the manufactured article by the introduction of milk and cream; that this having been done, the article contains all the elements of butter produced from the pure unadulterated milk, or cream from the same, except that the percentage of butterine is slightly smaller; that the only effect of butterine is to give flavor to the butter, and it has nothing to do with its unwholesomeness; that the oleaginous substances in the manufactured article are substantially identical with those produced from milk or cream; that the article sold by the defendant to the prosecuting witness was a wholesome and nutritious article of food, and in all respects as wholesome and healthful as butter produced from pure unadulterated milk or cream.

This for the purpose of showing that "the statute is unconstitutional, and not a lawful exercise of the police power."

Defendant further offered to prove "that he is engaged in the grocery and provision business in the city of Harrisburg, and that the article sold by him was part of a large and valuable quantity manufactured prior to the date of the passage of the statute in accordance with the laws of this commonwealth relative to the manufacture and sale of said article, and so sold by him; and that for the manufacture of said article large investments were made in the purchase of suitable real estate, the erection of proper buildings, and the purchase of the necessary machinery and implements; that in his traffic in the said article the defendant made large profits, and that if the said defendant should be prevented from trafficking in said article the value of his property engaged therein would be entirely lost, and he would be deprived of the means of livelihood." This for the purpose of showing "that the Act is void because it deprives the defendant of the lawful use of his property, liberties, and faculties, and destroys his property without making compensation."

On objection by the district attorney that the testimony recited in these offers was irrelevant and immaterial, it was excluded by the court. If there was error in this, defendant is entitled to a new trial.

But we are unable to see how the admission of this testimony could have legally changed the result.

With respect to the first offer, we are by no means prepared to say, even, that an offer to show that oleomargarine butter or butterine is made, generally, from pure animal fats by a pure and wholesome process, and is as wholesome and nutritious an article of food as genuine butter, would have been relevant. But this we are now called upon to decide. The offer made was to show merely that the article admitted to have been sold in this case was such. No one doubts that it might be made as stated in the offer. But it is no less certain that it may be made out of oleaginous substances and compounds that are neither pure nor wholesome. How, then, could evidence that the substance sold in any given case, and admitted to be that proscribed by the Act, was pure and wholesome, tend to show that the statute which forbids all sales is unconstitutional? As well might a defendant on trial for selling spirituous liquors in a jurisdiction where all such sales were prohibited, while admitting that he had sold the prohibited article, offer to prove, by way of defense, that the particular glass of liquor sold was pure and wholesome. Witnesses could be called in almost every case who would be willing so to testify, but no court would admit such testimony for the purpose of showing that a prohibitory statute was unconstitutional.

Indeed, the question of the constitutionality of a statute cannot be determined on the testimony of witnesses, for the very conclusive reason that it is a question of law and not of fact, and must be decided by the court on quite other grounds than those of the opinions and beliefs of witnesses. We are satisfied it was not error to refuse the testimony recited in the first offer.

We may here remark that this offer brings into view one of the reasons that impelled the legislature to pass this Act. It states that the amount of butterine in the manufactured article was increased by the introduction of milk and cream, and that the only effect of butterine is to give flavor to the butter. Manifestly the purpose was to give this article as nearly as possible the flavor and semblance of butter, so that it might be sold as such by the retailer without detection, and no doubt this is the " fraud in the sale " which the Act was designed to prevent.

We adopt, on this point, and apply to the statute now in question, the language of the Supreme Court of Missouri, in State *v.* Addington, 77 Mo., 110 :

" The central idea of the statute before us seems very manifest; it was, in our opinion, the prevention of facilities for

selling or manufacturing a spurious article of butter, resembling the genuine article so closely in its external appearance as to render it easy to deceive purchasers into buying that which they would not buy but for the deception. The history of legislation on this subject, as well as the phraseology of the Act itself, very strongly tends to confirm this view. If this was the purpose of the enactment, we discover nothing in its provisions which enables us, in the light of the authorities, to say that the legislature, when passing the Act, exceeded the power confided to that department of the Government. And unless we can say this, we cannot hold the Act as being anything less than valid."

As to the second offer, it is to be observed that defendant did not propose to prove that the article was manufactured by him, nor that he purchased it, or owned it, prior to May 21st, the date of the passage of the Act, nor even prior to July 1st, when it went into effect. Therefore, as was said of a like offer, by Mr. Justice BRADLEY, in his concurring opinion. in Bartemeyer v. Iowa, 18 Wall., 129, on page 136: "The law was not in this case an invasion of property existing "—in the defendant—"at the date of its passage, and the question of depriving a person of property, without due process of law, does not arise. No one has ever doubted that the legislature may prohibit. the vending of articles deemed injurious to the safety of society, provided it does not interfere with vested rights of property."

The motions for a new trial and in arrest of judgment are overruled, and the district attorney is at liberty to move for judgment upon the verdict.

On 29th January, 1886, the court sentenced the defendant to pay a fine of one hundred dollars and costs of prosecution, or give bail to pay the same within ten days, and directed that he be in custody until the sentence was complied with. On 16th March, a writ of error was allowed by the Supreme Court upon condition of the entry of recognizance, with surety to be approved by a judge of the Court of Quarter Sessions, in the sum of five hundred dollars, conditioned for the appearance of the defendant at the first term of said court, after judgment entered on writ of error, etc. On 20th March, 1886, the bond was approved and filed, and on 30th March the writ of error from the Supreme Court was received and filed.

The defendant filed the assignments of error above shown, and also the following:

The Act of Assembly of May 21st, 1885, under which this indictment was found against the defendant, and sentence pronounced, is unconstitutional and void, because it is in conflict with the Fourteenth Amendment of the Federal Constitu-

tion which provides that : " no state shall make or enforce any
law which shall abridge the privileges or immunities of citizens
of the United States; nor shall any state deprive any person
of life, liberty or property without due process of law, nor
deny to any person within its jurisdiction the equal protection
of the laws.   (Fifth assignment of error.)

*D. T. Watson*, (*Weiss & Gilbert* with him), for plaintiff in
error.—" The legislature may enjoin, permit, forbid, and pun-
ish ; they may declare new crimes and establish rules of con-
duct for all its citizens in future cases; they may command
what is. right and prohibit what is wrong, but they cannot
change innocence into guilt, or punish innocence as a crime;
or violate the right of an antecedent lawful private contract
or the right of private property.   To maintain that our Fed-
eral or state legislature possesses such powers, if they  had
not been expressly restrained, would, in my opinion, be a
political heresy altogether inadmissible in our free govern-
ment:" Calder *v.* Bull, 3 Dallas, 386.

" Indeed, some of the greatest jurists and judges of England
have not hesitated to declare that an Act of Parliament against
common right and natural equity is void:" Angell & Ames on
Corporations, 11th Div., sec. 767, page 334; Bracton, L. 4,
fol. 222;   Dr. Bonham's Case, 8 Rep., 234 ; London *v.* Wood,
8 Mod., 637; Day *v.* Savage, Hob., 87; Maryland University
*v.* Williams, 9 Gill. & J., 408.

In the case of Sharpless *v.* Mayor, 9 Harris, 168, the court
said, in declaring that certain forms of taxation would be
illegal: " These things are not excepted from the powers of
the legislature, because they do not pass to the assembly by
the general grant of legislative power.   The prohibition was
not necessary.

There is, therefore, a limitation to the exercise of all legis-
lative power which does not depend upon the provisions of
either the  federal or state Constitution, and that limitation is
to be determined and declared by the judiciary.   The police
power of the state, like that of taxation, is not unlimited in its
range and extent, but is subject to- judicial examination, and
must be controlled by the courts, where it exceeds its proper
bounds : R. R. Co. *v.* Husen, 5 Otto, 470; Com. *v.* Alger, 7
Cushing, 85; Austin *v.* Murray, 16 Pick., 126 ; Watertown *v.*
Mayo, 109 Mass., 319; Coe *v.* Shultz, 47 Barb., 65; In re
Jacobs, 98 N. Y., 98; In re Ryors, 72 N. Y., 3; Henderson
*v.* Mayer, 92 U. S., 259; Chy Lung *v.* Freeman, 92 U. S., 275.

In the case of the Commonwealth against Pennsylvania
Canal Company, 66 Pennsylvania, 41, the exercise of the
power there questioned was claimed in the argument of coun-

sel to rest upon the police power. This view was rejected by
the court, and would not have been accepted, it is respectfully
asserted, even if that declaration had been made in the body
of the statute. It is, therefore, the law that when an Act of
Assembly is passed ostensibly for the public health, the courts
are at liberty to examine the Act, and decide whether it
really relates to or promotes the public health; and where it
fails of this intention or object, and interferes with the lib-
erty, or takes away the property of a citizen, it is the duty of
the court to declare it an illegal exercise of the legislative
power.

It is respectfully submitted that the contrary view held by
the court below, that a legislative declaration that a statute
was intended to benefit the public health or morals is conclu-
sive of its character and necessity, and forbids subsequent judi-
cial inquiry, is denied by the preceding authorities, and is not
sustained by those which are cited in this opinion.

The intolerable hardship of this case consists in the fact that
on the 22d of May, 1878, (P. L., 1878, page 37,) an Act of
Assembly was passed " to prevent deception in the sale of but-
ter and cheese." This Act was succeeded by one passed on
24th May, 1883, (P. L., 1883, page 43,) "for the protection
of dairymen, and to prevent deception in sales of butter and
cheese." Each of these laws prescribed the manner in which
oleomargarine butter should be made, and sanctioned its mak-
ing as a lawful industry. Relying on their provisions, and
believing that the policy of the state thus declared, to be the
regulation and not the prohibition of this industry, great in-
vestments were made in real and personal property for con-
ducting the business, and there was a large amount of
manufactured product on hand at the time when the Act of
Assembly in question was passed. This law not only forbade
the continued manufacture of this article, but it destroyed,
without compensation, the value of that already manufactured,
by denying to the owner the right of sale. For this additional
reason it is asserted that this Act is unconstitutional and void:
Mynehaven v. People, 13 N. Y., 378; Bartemeyer v. Iowa, 18
Wall., 139; New Orleans Water Co. v. St. Tammany Water
Co., 14 Fed. Rep., 194.

We, therefore, respectfully insist that the Act of 31st May,
1885, is unconstitutional and void, for these reasons: We
have shown—

1. That in Pennsylvania all citizens have the right of per-
sonal liberty, including the freedom to enter into and pursue
any of the avocations or pursuits or professions of life. They
may acquire, sell and dispose of property; they may engage
in commerce and trade. These are indefeasible rights.

2. We have admitted that the General Assembly have a control of the exercise of these rights whenever it is necessary so to do to protect the equal rights of all other citizens and promote the public health and morals.

3. We have shown that whenever the General Assembly does pretend to exercise the police power, the statute it passes must as a fact relate to the public health and morals, and have that object in view. This, in our form of government, is a necessity.

4. We have shown that whenever a police law is challenged as unconstitutional, because it does not involve the public health—because it is not a regulation of private freedom for the public good—because it is in derogation of the Bill of Rights—it becomes a judicial question for the courts to decide. What is the rule which this court will apply to determine whether the Act challenged is constitutional or not.

We admit the rule as laid down in Sharpless *v.* The Mayor, 9 Harris, 147, that the Act must plainly and palpably offend the express words or the fair implication from the words of the Constitution.

But how shall the court determine that? Evidently (1) by the Act itself, or, (2) if necessary, by the facts in any given case.

The court rule seems to be laid down by the Court of Appeals, of New York, in the matter of the Application of Jacobs, 98 New York, page 115, where it is said : " When a health law is challenged in the courts as unconstitutional, on the ground that it arbitrarily interferes with personal liberty and private property without due process of law, the courts must be able to see that it has at least in fact some relation to the public health, that the public health is the end actually aimed at, and that it is appropriate and adapted to that end :" People *v.* Max, 99 N. Y., 377.

This court, in Seely *v.* City of Pittsburgh, 82 Pa, St., 360, adopted the proposition that an Act of Assembly might be constitutional or unconstitutional just as the facts of the case were. That different juries might find in different ways on the same evidence, was immaterial. That case has been repeatedly followed and approved.

Applying these rules and principles, is the Act of Assembly under which the plaintiff in error was convicted and sentenced constitutional?

*Samuel J. M. McCarrell,* District Attorney, for the Commonwealth.—This Act for the protection of the public health, prohibits the sale as an article of food, of any substance, designed to take the place of butter, which is not made exclusively from

pure milk or cream from milk. The legislative conclusion is, as clearly appears from the words of the Act, that all articles in imitation of butter, or designed to take the place of butter, made from any substance except pure milk, or cream, are injurious to the public health. Therefore, in order to carry out the purposes declared in the title, the legislature prohibits the sale of any such article to be used as food. Thus the declared purpose of the Act is in exact harmony with its provisions; and the subject of the legislation being admittedly within the line of legislative authority, the constitutionality of the enactment cannot be successfully denied : Sharpless *v*. Philadelphia, 9 Harris, 161.

The only case which the industry of counsel for plaintiff in error has been able to discover, holding that legislation similar to this has been held unconstitutional, is that of People *v*. Mark, 99 N. Y., 377. The title to that Act discloses no legislative purpose to protect the public health. The argument on behalf of the people seems to have conceded that the sole purpose of that legislation was to prohibit an important branch of industry for the purpose of making another branch more profitable ; and as it is clearly shown by the learned judge who decided this cause in the court below, the decision of the N. Y. Court, in the case cited, rested solely upon that remarkable concession. There is no such concession in the present cause, and the case cited, we respectfully contend, has no application here.

On March 24th, 1881, the legislature of Missouri passed an Act in substantially the same language as that now under consideration. It was entitled " An Act to prevent the manufacture and sale of oleaginous substances or compounds of the same in imitation of the pure dairy products." This Act was considered and sustained by the Court of Appeals and by the Supreme Court, in the case of the State *v*. Addington, 12 Missouri Appeal Reports, 214–228, and 77 Missouri, 110. If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance by any incidental inconvenience which individuals or corporations may suffer.

All rights are held subject to the police power of the state :" Beer Co. *v*. Massachusetts, 97 U. S., 25–32.

*F. Carroll Brewster*, for P. H. McGann and others, manufacturers and dealers in oleomargarine.—The Act is contrary to and in violation of art. 1, sec. 1, of the Constitution of Pennsylvania, which declares :—

Sec. 1. All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquir-

ing, possessing and protecting property and reputation, and of pursuing their own happiness.

Sec. 26. To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government, and shall forever remain inviolate.

1. It is not within the power of the legislature, under the pretence of exercising the police power of the state, to enact laws not necessary to the preservation of the health and safety of the community, that will be oppressive and burdensome on the citizens: State *v.* Fisher, 52 Mo., 174; Toledo, &c. Railroad *v.* Jacksonville, 67 Ill., 37; In re Jacobs, 98 N. Y., 98; State *v.* Addington, 77 Mo., 116; Slaughter House Cases, 16 Wall., 36; People *v.* Marx, 99 N. Y., 377.

2. And the courts must inquire into the motives of the legislature as they may be disclosed on the face of the Acts, or inferable from their operation considered with reference to the condition of the country and the existing legislation: Toledo, &c. Railroad *v.* Jacksonville, 67 Ill., 37; In re Jacobs, 98 N. Y., 98; Watertown *v.* Mayo, 109 Mass., 319; Soo Hung *v.* Crowley, 113 U. S., 703; Austin *v.* Murray, 16 Pick., 126; Coe *v.* Schultz, 47 Barb., 69; People *v.* Marx, 99 N. Y., 377.

This Act, which forbids the manufacture or the sale of not only oleomargarine, but of any other substance which may hereafter be discovered as a substitute for butter, regardless of its qualities and benefits, can, tested by the above standards, have for its only object and motive the prevention of competition: In re Brosnahan, 18 Fed. Rep., 67; State *v.* Mugler (BREWER, J.), 44 Am. Rep., 634; People *v.* Cipperly, 37 Hun., 319; People *v.* Marx, 99 N. Y., 377; Dist. of Columbia *v.* Saville, 1 McArthur, 581.

The Act is also contrary to and in violation of art. 3, sec. 3, of Constitution of Pennsylvania, which declares:—

"No bill, except general appropriation bills, shall be passed, containing more than one subject, which shall be clearly expressed in its title."

1. The title of this Act is double, and perhaps three-fold. If the Act conforms to the title, it violates the first clause of sec. 3; if it does not conform to this title, it violates the last clause of sec. 3.

2. The Act itself contains one subject which the title, whether single or double, does not clearly express: West. Manf'g Co. *v.* Chambers, 25 North. West. Rep., 372; Dorsey's Appeal, 22 P. F. S., 192; Beckert *v.* Allegheny, 4 Norris, 191; State *v.* Newton, 16 Vroom, 469.

*R. C. McMurtrie* submitted a brief in behalf of manufactur-

[Powell v. Commonwealth.]

ers and dealers in oleomargerine.—The Act of 21st May, 1885, is unconstitutional, because the subject of the bill is not clearly expressed in its title, as required by art. 3, sec. 3, of the Constitution.

What does the title profess the object of the Legislature to be ?

1. The protection of the public health.

2. The prevention of adulteration of dairy products.

3. The prevention of fraud in the sale of dairy products.

Which one of these things is even attempted to be accomplished by the enactment? Not one. All that is done is done irrespective of the effect on the health of the public. It prohibits a substitute for butter as food even to those to whom butter may be poisonous, and the substitute beneficial.

There is no allusion to health—nothing is conditional on the thing being deleterious, or even suspected to be so. The making of anything out of olive oil, if designed to take the place of dairy butter or cheese as an article of food, is made criminal. To make cheese from goat's milk is made a crime. Motive, consequences, effects are of no moment, and are excluded from the definition of the crime. And so with the other two objects. It is immaterial that there is no adulteration; it is immaterial that there is no fraud. It is intended to and does, if the Act is a lawful statute, make it criminal to make or sell a compound of animal fats if intended to be used as food as a substitute for dairy butter: Beckert v. Allegheny, 4 Norris, 191; Dorsey's Appeal, 22 P. F. S., 192; Holmes' Appeal, 27 P. F. S., 77.

Apart from restraining clauses of the Constitution, and looking at it as a question of power, a more serious case to a reflecting mind can hardly be presented.

In the interest of a small body of the community, and to protect their products from being reduced in value by a cheap substitute, the Legislature has prohibited the manufacture and sale of an article of food, invented at the instance of the French government, for use by its troops by highly scientific men.

If this power is possessed, if any honest and lawful occupation can be made criminal because it lowers the price of commodities or labor (and success here will prove the scheme can be successful), surely it is a subject for serious thought.

*Wayne Mac Veagh*, for defendant in error.—There is no rule of construction more fully settled by our courts than this: The words of the Constitution furnish the only test to determine the validity of a statute, and all arguments based on general principles outside of the Constitution must be addressed

to the people and not to the court: Sharpless *v.* Mayor of Philadelphia, 21 Pa. St., 147.   See also Respublica *v.* Duquet, 2 Yeates, 493 ; Commonwealth *v.* McClosky, 2 Rawle, 374 ; Pittsburg *v.* Scott, 1 Pa. St., 309 ; Norris *v.* Clymer, 2 Pa. St. ; 284 ; Commonwealth *v.* McWilliams, 11 Pa. St., 61 ; Commonwealth *v.* Hartman, 17 Pa. St., 118 ; Speer *v.* Blairsville, 50 Pa. St., 150 ; Penna. R. R. Co. *v.* Riblet, 66 Pa. St., 164 ; Lewis's Appeal, 67 Pa. St., 153 ; Commonwealth *v.* Butler, 99 Pa. St., 535.

The power of the Parliament of England is almost absolute : 1 Blackst. Com., 160.   The American legislatures possess the absolute legislative powers of the British Parliament, without possessing its executive and judicial functions : Cooley's Const. Lim., 86–92 ; Thorpe *v.* Rut. & Burl. R. R., 27, 97–140 ; Luber's Civil Liberty and Self Government, 161.   The remedy for an unwise or impolitic or unfair Act of the Legislature is in that appeal to the people which is so freely exercised when obnoxious, but confessedly constitutional, laws are enacted : Ervine's Appeal, 16 Pa. St., 268.

Said Mr. Justice IREDELL, in Calder *v.* Bull, 3 Dall., 399 : If the legislature of the Union, or the legislature of any member of the Union, shall pass a law within the general scope of their constitutional power, the court cannot pronounce it to be void, merely because it is, in their judgment, contrary to the principles of natural justice.   The ideas of natural justice are regulated by no fixed standard; the ablest and the purest men have differed on the subject; and all that the court could properly say in such an event would be that the legislature, possessed of an equal right of opinion, had passed an Act which, in the opinion of the judges, was inconsistent with the abstract principles of natural justice.

The Constitution allows the Legislature every power which it does not positively prohibit : Norris *v.* Clymer, 2 Pa. St., 285 ; Commonwealth *v.* Hartman, 17 Pa. St., 118.

If the legislature possesses the power to pass a particular law or a particular class of laws, by reason of the fact that no restriction upon its exercise of the power is to be found in the Constitution, it is obviously improper and immaterial to inquire as to the nature or purpose of the law, except in so far as is necessary to intelligently test it by the constitutional restrictions.   It is the duty of the legislature to make laws for the good of the people.   But whether a particular law is for the good of the people, it is not for the courts to decide in passing upon the constitutionality of the law.   Judge Cooley says on this point : " The legislature is to make laws for the public good, and not for the benefit of individuals.   It has control of the public moneys, and should provide for dis-

bursing them only for public purposes. Taxes should be levied for those purposes which properly constitute a public burden. But what is for the public good, and what are public purposes, and what does properly constitute a public burden, are questions which the legislature must decide upon its own judgment, and in respect to which it is vested with a large discretion which cannot be controlled by the courts, except perhaps when its action is clearly evasive, and where under pretence of a lawful authority it has assumed to exercise one that is unlawful": Constitutional Limitations, star page 129; Webster's Works, VI., 227.

For the court to attempt to sit in judgment on the present Act on the ground that it has no basis in a public purpose, is indeed inquiring into the motives of the legislature, which it has been decided over and over again cannot be done. The courts cannot impute to the legislature any other but public motives for their Acts: Sunbury & Erie R. R. Co. v. Cooper, 33 Pa. St., 278; People v. Draper, 15 N. Y., 545; Cooley's Constitutional Limitations, star page 187; Hamilton's Works, IV., 105; New York v. Miln, 11 Peters, 102; License Cases, 5 How, 504; Braddie v. Brownfield, 2 W. & S., 285; Calder v. Bull, 3 Dall., 388.

A no less conclusive basis upon which to rest the argument for the constitutionality of the present law is that upon which it was placed by the court below, namely, the police power of the state: Munn v. Ill., 94 U. S., 125.

The statute books of Pennsylvania contain such penal laws as the following, analogous in principle with the present law:

Forbidding the sale or keeping for sale of unwholesome or adulterated provisions, drugs, &c.: Purd. Dig., 10th ed., Crimes, section 99.

Forbidding the sale of poisonous drugs without label: Purd. Dig., Crimes, section 100.

Forbidding the importation of convicts: Purd. Dig., Crimes, section 106.

Forbidding the attendance of female servants in theatres or concert saloons: Purd. Dig., Crimes, section 112.

Requiring the sale of shell fish only in certain months and in a certain manner: Purd. Dig., Crimes, section 115.

Prohibiting cashiers of banks from engaging in any other profession or occupation: Purd. Dig., Crimes, section 93.

Requiring that bread shall be sold only by weight: Purd. Dig., 10th ed., page 175.

Declaring that butter and lard for exportation shall be subject to inspection and put up in a certain way: Purd, Dig., page 188.

4 AMERMAN —19

Forbidding the use of injurious and impure materials in the manufacture of liquors: Act 2d June, 1881, P. L., 43.

Forbidding the sale of deadly weapons and explosives to minors: Act 10th June, 1881, P. L., 111.

Many other laws are in force in this and other states, suppressing gambling houses, enforcing rigid quarantine regulations, regulating the storage and carrying of gunpowder, the use of steam boilers and the like.

These have never been objected to as unconstitutional.

The following are among the police laws that have been declared by the courts constitutional:—

The statute prohibiting the performance of worldly business on Sunday: Specht *v.* Commonwealth, 8 Pa. St., 312; Waldo *v.* Commonwealth, 9 W. N. C., 200.

Health and quarantine laws: Board of Health *v.* Lloyd, 1 Phila., 20.

The law prohibiting the erection of wooden buildings in cities: Respublica *v.* Duquet, 2 Yeates, 493.

The law authorizing the summary conviction of professional thieves: Byers *v.* Commonwealth, 42 Pa. St., 89.

The law forbidding the carrying of concealed deadly weapons: Wright *v.* Commonwealth, 77 Pa. St., 470.

The law regulating the sale of liquors: Commonwealth *v.* Schoenhutt, 3 Phila., 20.

The law forbidding the sale of railroad tickets except by the authorized agents of railroad companies: Commonwealth *v.* Wilson, 9 W. N. C., 291.

A statute making it an offense to sell any pistol except certain kinds—as the "navy" pistol: Dabbs *v.* State, 39 Ark., 353.

Rigid prohibitory liquor laws have been held constitutional or recognized as such in the following states whose constitutions are very similar to our own:—Maine, Vermont, Massachusetts, Connecticut, Delaware, Michigan, Illinois, Iowa and Kansas: Cooley Const. Limitations, page 582, notes 1 and 2; State *v.* Mugler, 29 Kan., 252. There are but two cases in which constitutional objections to prohibitory liquor laws have been upheld. These are Beebe *v.* State, 6 Ind., 501, and Wynehamer *v.* People, 13 N. Y., 378. "Against the doctrine of these two cases," said Judge Thompson in State *v.* Addington, 12 Mo. Appeals, 223, "stands arrayed the opinion of every other state in the Union, so far as we know, where the question has been passed upon, and also that of the Supreme Court of the United States."

Dangerous machinery may be regulated and the owners required to put guards around it: Mayor *v.* Williams, 15 N. Y., 502.

The keeping of dogs may be discouraged by inflicting a penalty on their owners for keeping them: Mitchell v. Williams, 27 Ind., 62; State v. Cornell, Id., 120.

License fees may be imposed to prevent people from carrying on business injurious to the health, safety or welfare of society: Tenney v. Lenz, 16 Wis., 566; Carter v. Dow, Id., 298. The laws most nearly identical in principle with the Pennsylvania oleomargarine law are those which forbid the sale or offer of sale of adulterated provisions. The sale of pure milk and pure water mixed may be made a penal offense: Commonwealth v. Waite, 11 Allen, 264; See also State v. Smith, 10 R. I., 258; State v. Groves, 15 R. I.; Polinsky v. State, 73 N. Y., 65; State v. Newton, 45 N. J. L., 469; See as to adulteration of confectionery, Commonwealth v. Chase, 125 Mass., 202; Commonwealth v. Evans, 132 Mass., 11.

*Hall* (*Jordan* with him), also presented a paper book and were heard for the defendant in error.—" The legislative power of this commonwealth shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives."

Under this general grant, " the legislature possesses all legislative power, except such as is prohibited by express words or necessary implication : " Lewis and Nelson's Appeal, 17 P. F. S., 153, 165; Sharpless v. The Mayor, 9 Harris, 147.

" A law that is unconstitutional is so because it is either an assumption of power not legislative in its nature, or because it is inconsistent with some provision of the federal or state Constitution : " Commonwealth v. Maxwell, 3 Casey, 444, 456; Sharpless v. The Mayor, supra, Hawthorne v. The People, 109 Ill. Rep., 302; Bertholf v. O'Reily, 74; New York Rep. 509.

" The general principles of justice, liberty, and right, not contained or expressed in that instrument (the Constitution) are no proper elements of a judicial decision upon it : " Sharpless v. The Mayor, 147, supra.

All legislative enactments are presumed to be constitutional, and the burden of proving the contrary is upon him who alleges it: Craighead v. First Presbyterian Church, 7 Norris, 42 and 46; Hawthorne v. The People, 109 Ill., 302.

" A law passed by the legislature is presumed to be constitutional until clearly shown to be otherwise; and the existence of the facts necessary to make the law valid must be taken *prima facie* for true, as an inference from the law itself: " Erie and North-East Railroad Company v. Casey, 2 Casey, 287; Commonwealth *ex relatione* Wolfe, 3 Out., 535; Pennsylvania Railroad Company v. Riblet, 16 P. F. S., 164.

[Powell *v.* Commonwealth.]

" But, as legislative power must be guided by its own wis-
dom and knowledge, so it may take its own way of informing
itself; and the courts cannot set aside its action, on their sup-
position or conviction that it is founded on misinformation : "
2 Casey, supra, 310.

The police power being a legislative power, "the propriety
of its application is a legislative and not a judicial question : "
Bertholf *v.* O'Reilly, 74 N. Y., 524; Cooley, *596.

" All the presumptions are in favor of the constitutionality
of an Act of Assembly. It comes to us with the seal of ap-
proval of two of the co-ordinate departments of the Govern-
ment. To doubt is to decide in favor of its constitutionality : "
Craig *v.* First Presbyterian Church, 7 Norris, 46; Sharpless *v.*
The Mayor, 9 Har., 147; Hawthorn *v.* The People, 109 Ill.,
302.

" A law prohibiting the brewing and selling of beer applies
to beer lawfully brewed before the law took effect, but sold
thereafter : " State *v.* Mugler, 44 Am. Rep., 634 : State *v.* Bur-
goyne, 7 Lea, 173, and 40 Am. Rep., 60.

Mr. Justice STERRETT delivered the opinion of the court,
January 3d, 1887.

In his opinion, overruling the motions for a new trial and in
arrest of judgment, the learned President of the Quarter Ses-
sions has so fully and conclusively vindicated the correctness of
the rulings complained of in the several specifications of error,
that the judgment may well be affirmed, for the cogent and
satisfactory reasons there presented. He has shown, very
clearly, we think, that the Act of May 21st, 1885, under
which plaintiff in error was indicted, is not in conflict with
any provision of either the state or federal Constitution, and
that the General Assembly, in enacting the law, did not tran-
scend the limits of legislative authority ; but if there should
be any doubt as to the constitutionality of the Act on either of
these, or on any other ground, that doubt should be resolved
in favor of the validity of the Act, as a proper exercise of leg-
islative power. As was said in Erie and North East Railroad
Co. *v.* Casey, 26 Pa., 287–300 : " The right of the judiciary to
declare a statute void and to arrest its execution is one which,
in the opinion of all courts, is coupled with responsibilities so
grave that it is never to be exercised except in very clear
cases. One department of the government is bound to pre-
sume that another has acted rightly. The party who wishes
to pronounce a law unconstitutional takes upon himself the
burden of proving beyond all doubt that it is so." Or, as the
principle is tersely stated by the late Chief Justice SHARS-
WOOD, "Nothing but a clear violation of the Constitution—a

clear usurpation of power prohibited—will justify the judicial
department in pronouncing an Act of the legislative depart-
ment unconstitutional and void": Penna. R. R. Co. v. Rib-
let, 66 Pa., 164–169. In same case it is further said: "We
cannot try the constitutionality of a legislative Act by the
motives and designs of the law-makers, however plainly ex-
pressed. If the Act itself is within the scope of their author-
ity, it must stand."

These principles are necessary incidents of the law-making
power. In creating a legislative department, and conferring
upon it the legislative power, the people must be understood
to have conferred the full and complete authority as it vests
in and may be exercised by the sovereign power of any state,
subject only to such restrictions as they have seen fit to im-
pose, and to the limitations which are contained in the Con-
stitution of the United States. The legislative department is
not made a special agency for the exercise of specially defined
legislative powers, but is intrusted with the general authority
to make laws at discretion: Cooley's Con. Lim., 87.

The Act of May 21st, 1885, is entitled, "An Act for the
protection of the public health, and to prevent adulteration of
dairy products and fraud in the sale thereof." It cannot be
doubted that the General Assembly is invested with full pow-
er to legislate for the protection of the public health, or to
prevent the adulteration of articles of food, as well as imposi-
tion or fraud in the sale of such articles. In the absence of
any constitutional inhibition or limitation, the sovereign power
of the state to enact laws for the public good appears to em-
brace these subjects of legislation; but, however that may be,
they come fairly within the police powers of the state. These
powers, as described by Judge REDFIELD in Thorpe v. Rail-
road Co., 27 Vermont, 149, extend "to the protection of the
lives, limbs, health, comfort and quiet of all persons, and the
protection of all property within the state, . . . . . and by
which persons and property are subjected to all kinds of re-
straints and burdens, in order to secure the general comfort,
health and prosperity of the state; of the perfect right to do
which, no question ever was, or, upon acknowledged general
principles, ever can be made, so far as natural persons are
concerned."

The statute books of this and other states furnish numerous
examples of the exercise of the power referred to; but perhaps
the laws most nearly identical in principle with our Act are
those which prohibit the sale of adulterated provisions. The
sale of pure milk and pure water mixed may be made a penal
offence (Com. v. Farren, 91 Mass., 489; Same v. Waite, 93

Id., 264), or adulterated confectionary: Com. *v.* Chase, 125 Mass., 202; Same *v.* Evans, 132 Id., 11.

The statute of Massachusetts declares: "Whoever sells or keeps or offers for sale adulterated milk, or milk to which water or any foreign substance has been added," shall be punished, etc.   In Com. *v.* Farran, *supra*, it was held, under this statute, that guilty knowledge on the part of the seller need not be averred or proved.   In Com. *v.* Waite, *supra*, the contention was that inasmuch as it is innocent and lawful to sell either pure milk or pure water, or both, separately, the legislature has no power to make the sale of milk and water when mixed a penal offence, unless it is done with a fraudulent intent; but the court said: "It is notorious that the sale of milk adulterated with water is extensively practiced with a fraudulent intent.   It is for the legislature to judge what reasonable laws ought to be enacted to protect the people against this fraud, and to adapt the protection to the nature of the case. . . . . . The court can see no grounds for pronouncing the law unreasonable, and has no authority to judge of its expediency."   Speaking of the prohibitory liquor law of Massachusetts, passed in 1869, the Supreme Court of the United States says: " If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance by any incidental inconvenience which individuals or corporations may suffer.   All rights are held subject to the police power of the state. . . . . . Whatever differences of opinion may exist, as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health and property of the citizens, and to the preservation of good order and the public morals.   The legislature cannot, by any contract, divest itself of the power to provide for these objects.   They belong emphatically to that class of objects which demand the application of the maxim, *salus populi suprema lex;* and they are to be attained and provided for by such appropriate means as the legislative discretion may devise.   That discretion can no more be bargained away than the power itself": Beer Company *v.* Massachusetts, 97 U. S., 25.

So far as the constitutionality of the Act under consideration depends on the police power of the state, it may safely be rested on the principle underlying the cases above referred to and others that might be cited.   The manufacture, sale and keeping with intent to sell, may all alike be prohibited by the legislature, if in their judgment the protection of the public

from injury or fraud requires it.    To deny the authority of the legislature to do so, is to attack all that is vital in the police power.    To refuse recognition of the power, in a given case, because, in the judgment of some, the legislature, though acting within its proper sphere, may have mistaken the public necessity for a law prohibitory in its character, is to make the individual judgment superior to that of the legislature, to which the people in their sovereign capacity have delegated the law-making power.

The fact that the prohibited substances, in a pure state, may be wholesome and not injurious, is irrelevant in a judicial inquiry.    Their wholesomeness will not render the Act unconstitutional.    The statute is intended to prevent fraud and protect the public health by prohibiting the manufacture and sale of substances and compounds which furnish the temptation to commit the former, and which may be injurious to the latter. As was said by the Supreme Court of Missouri, in State v. Addington, 77 Mo., 110, the position, that to render the law unconstitutional the prohibited articles must be unwholesome, would utterly overthrow the police power of the state—overthrow every law, the wisdom of which could not bear the test of scrutiny.

The case last referred to arose under a statute similar to ours, entitled, " An Act to prevent the manufacture and sale of oleaginous substances, or compounds of the same, in imitation of the pure dairy products."    In a well-considered opinion, the constitutionality of this Act was sustained by the Court of Appeals (12 Mo. Ap. Rep., 214, 228), and afterwards by the Supreme Court of that state : State v. Addington, 77 Mo., 110. The mere fact, as was said in that case, that experts may pronounce a manufactured article, intended for human food, to be wholesome or harmless, does not render it incompetent for the legislature to prohibit the manufacture and sale of the article.    The test of the reasonableness of a police regulation, prohibiting the making and vending of a particular article of food, is not alone whether it is in part unwholesome and injurious.    If an article of food is of such a character that few persons will eat it knowing its real character; if, at the same time, it is of such a nature that it can be imposed upon the public as an article of food which is in common use, and against which there is no prejudice; and if, in addition to this, there is probable ground for believing that the only way to prevent the public from being defrauded into the purchasing of the counterfeit article for the genuine is to prohibit altogether the manufacture and sale of the former,— then we think such a prohibition may stand as a reasonable police regulation, although the article prohibited is in fact in-

[Powell *v.* Commonwealth.]

nocuous, and although its production might be found beneficial
to the public, if in buying it they could distinguish it from the
production of which it is the imitation." . . . . . " The manu-
facturers may brand it with its real name.  It may carry that
brand into the hands of the broker or commission merchant,
and even into the hands of the retail grocer ; but there it will
be taken off, and it will be sold to the consumer as real butter,
or it will not be sold at all.   The fact that in the present state
of the public taste, the public judgment, or the public preju-
dice with respect to it, it cannot be sold except by cheating
the ultimate purchaser into the belief that it is real butter,
. . . . . stamps with fraud the entire business of making and
vending it, and furnishes a justification for a police regulation
prohibiting the making and vending of it altogether ": State
*v.* Addington, *supra.*

In view of these and other considerations suggested in
the opinion referred to, and also in that of the court be-
low, we cannot say the Act in question is not a valid ex-
ercise of the police power of the state.   The legislature was
doubtless satisfied that the manufacture and sale of the pro-
hibited articles were prejudicial to the public good to such
degree that a remedy was needed ; and we have no right to
say that a penal statute, less severe and sweeping in its terms,
would have afforded an effective remedy.   That is a legisla-
tive and not a judicial question.   If it is thought the legisla-
ture erred in the solution of that question, the proper course
is an appeal to them to correct the error, if any there was.

For reasons above suggested, and others more fully elabor-
ated by the court below, we think the judgment should be
affirmed.

Judgment affirmed and record remitted.

Mr. Justice GORDON dissented, and filed the following opin-
ion :—

I regard the Act of the 21st of May, 1885, not only as im-
provident and unreasonable, but as unconstitutional.   " No
person, firm or corporate body, shall manufacture out of any
oleaginous substance, or any compound of the same, other
than that produced from unadulterated milk, or cream from
the same, any article designed to take the place of butter or
cheese produced from pure unadulterated milk, or cream from
the same, or imitation or adulterated butter or cheese, nor
shall sell, or offer for sale, or have in his, her or their posses-
sion, with intent to sell the same as an article of food."   A
glance at this Act shows that its purpose was to protect the
dairyman at the expense of the consumer.   Cannot a pure,
wholesome butter be made from some other oil than that ex-

[Powell v. Commonwealth.]

tracted from milk ? Certainly it can. The chemist has discovered that it may as well be manufactured from the fat of the cow as from the fat of her milk. " Oleomargarine, when made under the formula of the French patent, is composed mostly of beef fat churned with milk, and colored with annatto : " U. S. Agricultural Report, 1885, p. 100.   Here, then, is a pure and wholesome article of food, in every particular as good as the best butter ; why, then, shall we not be permitted to make use of it ?   The Act cannot properly be regarded as a police regulation, for it is not alleged that the prohibited article is in the slightest degree injurious to the welfare or happiness of the people of the Commonwealth.   On the other hand, proof to the contrary was offered, so that the question for discussion really involves the right of the legislature to prohibit the manufacture of an article of food without regard to its character or quality , a question certainly of very serious import.   The offer of proof was for the purpose of showing that the proscribed manufacture was not subject to the police power of the state, and from its very nature could not be. But the court ruled out the proposed evidence as irrelevant, thus declaring that the legislature was the sole judge of its own powers.   But this amounts to an assumption that the legislative power is such that the manufacture and sale of any article of food whatever may be prohibited.   So the question, in fact, is not one of police power, but whether the legislature can in contravention of fact assume that any given article of commerce is within the scope of its police powers, and thereupon prohibit its manufacture and use.   Truly, if this position taken by the court below be correct, then is the defendant's case indefensible, for if the legislature can define its own powers without regard to constitutional limit, an appeal to this court is to no purpose.   In this, however, the commonwealth is at fault ; the Quarter Sessions has imposed a burthen upon it which it cannot sustain.   Its counsel have said a great deal about the police powers of states, and have cited many cases to prove that which no one has pretended to deny, but they have utterly failed to prove that the General Assembly has the unrestricted power claimed for it.   But if this astounding assumption fails, the defendant was wrongfully convicted. Let us then consider to what result a doctrine of this kind must necessarily lead.   We must take it that that which was sold by the defendant was good, pure and wholesome food, for such was the purport of the proposed proof ; hence, it follows, as of course, that if the legislature can prohibit the making of butter from anything but milk, it can prohibit its manufacture altogether, for pure milk is certainly no better than pure tallow, and if it can prohibit its manufacture from the latter, it

can also from the former; if it can make unlawful the making and sale of one kind of pure food it can, in like manner, make unlawful the making and sale of any other. Lard, as it is found in the market, is a manufactured article, and is largely used in cooking as a substitute for butter; for ages this has been the case as well in this country as in Europe, and no legislature has, as yet, taken exception to the practice on the ground of its unhealthfulness. Indeed, in this commonwealth many persons subsist, during the winter season, almost entirely on buckwheat and lard, and with hard working people, who require large quantities of carbonaceous food, this diet is neither unpleasant nor unwholesome. It is true that some may not regard it as good as butter, nevertheless it is cheaper, and, therefore, within the reach of those who cannot afford to pay for butter. Why then shall it not be used as heretofore? This wonderful Act of 1885 will allow us to eat it as a substitute for pork, or beef, or bread, or as a substitute for anything but butter. And yet this is called a police regulation; a law passed for the preservation of the health of the community!— to me it looks much more like a regulation passed for the welfare of the dairyman without regard to the welfare of the balance of the people; class legislation, that political curse, which the framers of the Constitution endeavored to prevent, but which our General Assembly seems disposed to perpetuate. Nor are we to forget that by our decision we do not merely give force to an Act of assembly, but are also establishing a precedent of the most dangerous character. For if the legislature can arbitrarily prevent the citizen from making or selling any given article of food, it can also prevent his buying or using the same however excellent it may be, and however necessary for the preservation of his own life and happiness, and that of his family. Yet this is the doctrine which this court is about to establish by its decision; a doctrine which must necessarily be founded on the ruins of the bill of rights. What a commentary on ninteenth century progress and civilization! This Act has made Chinese conservatism respectable. The chemist has discovered a process by which an important article of food can be manufactured more cheaply than by the old methods, and the man of scant means is thus promised an addition to his meager fare which he could not previously afford. Naturally we might suppose that this inventor would be hailed as the benefactor of his race, since he has thereby added much to the happiness of the laboring class of the people. But no; say our law makers, he is a malefactor, and shall neither make nor sell his product. And why? If, indeed, the legislature had not in view the protection of the dairyman, I would like to be told by some one what it had in

[Powell *v*. Commonwealth.]

view.    Of course, the commonwealth will not admit this as a solution of the question, for if a fact of that kind could be made to appear, the unconstitutionality of the Act would be undoubted; hence, this idea of police power has been set up as a lure which has been only too successful in attracting the attention of the court below, as well as this court, from the real issue.    What we have here said with reference to the legislative intention, is made all the more certain from the fact that the Acts of May 22d, 1878, and of June 10th, 1881, had already afforded sufficient protection to the community from deception in the sale and adulteration in the manufrcture, of butter, so that as a police regulation the Act of 1885 was not necessary. We cannot, therefore, but think that there can be but little if any doubt that this Act was designed to protect the interests of the producer at the expense of the welfare and rights of the consumer.

> Thus viewing the matter before us, I feel myself constrained to dissent from the judgment of this court.