## Commonwealth, Appellant, *v.* Pflaum.

*Constitutional law—Food law—Title of act—Definition of food—Sulphur dioxide—Act of May 13, 1909, P. L. 520—Classification.*

1. The Act of May 13, 1909, P. L. 520, entitled, "An Act relating to food; defining food; providing for the protection of the public health and the prevention of fraud and deception by prohibiting the manufacture or sale, the offering for sale, or exposing for sale, or the having in possession with intent to sell of adulterated, misbranded and deleterious foods, prescribing certain duties for the dairy and food commissioner in reference thereto; and providing penalties for the violation thereof," is not defective in title and violative of art. III, sec. 3, of the constitution, because confectionery is not specified in the title as one of the subjects legislated about.

2. Confectionery is a food and is covered by the words in the title "relating to food; defining food." Even if it were not a food in the ordinary acceptance of the term, yet as it is included in the catalogue of foods in the act, the title put on inquiry all persons interested as to what the legislature intended to include under the word "food."

3. The Act of May 13, 1909, is a police regulation. In the act the legislature has declared that sulphur dioxide is deleterious to health and has forbidden its use in the manufacturing of confectionery. The courts must therefore assume that this determination was reached after full examination and on reasonable grounds, and that in the judgment of a body having control of the subject such prohibition was necessary to promote the public health.

4. The Act of May 13, 1909, P. L. 520, does not violate sec. 7 of art. III of the constitution because it permits dealers in dried fruits and molasses to sell food containing sulphur dioxide while it prohibits dealers in confectionery and other foods from so doing. Such a classification is not improper, inasmuch as it is based upon substantial grounds of a practical nature, which the legislature without doubt took into consideration when the act was passed.

5. The Act of May 13, 1909, P. L. 520, is not unconstitutional because it gives to a retail dealer immunity from prosecution for its violation if he can establish a guaranty signed by the manufacturer that the food was not adulterated, while it gives no such immunity to a wholesale dealer or jobber. The classification between wholesale and retail dealers is proper because the transactions of the wholesaler are with large quantities and he has an opportunity to know the composition of the merchandise, while the retailer who buys his stock in small quantities has neither knowledge nor means of knowledge of the ingredients of the articles that he buys. At all events a wholesaler cannot set up such an objection.

6. Where sulphur dioxide is added to gelatine in the process of bleaching, and the gelatine is combined with sugar and other constituents to compose a confectionery, the sulphur dioxide is "added" within the meaning of the Act of May 13, 1909, P. L. 520.

7. A person may be convicted of violating the Act of May 13, 1909, P. L. 520, in selling confectionery to which sulphur dioxide has been "added" although he may not know that his merchandise contained the prohibited substance.

Submitted Dec. 15, 1911. Appeal, No. 218, Oct. T., 1911, by plaintiff, from judgment of Q. S. Phila. Co., March Sessions, 1911, No. 747, arresting judgment in case of Commonwealth v. Christian Pflaum, Jr. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ. Reversed.

Indictment for violating the Act of May 13, 1909, P. L. 520, in selling fifty candy marshmallow cocoanut pies containing sulphur dioxide.

The case turned on the constitutionality of the Act of May 13, 1909, P. L. 520.

*Error assigned* was the order arresting judgment.

*Samuel B. Rotan,* district attorney, *E. C. Rhoads, Wm. M. Hargest,* assistant deputy attorney general, and *John C. Bell,* attorney general, for appellant.—This act of assembly must be liberally construed: Stull v. Reber, 215 Pa. 156; Bechtel's Election Expenses, 39 Pa. Superior Ct. 292; Com. v. Kevin, 202 Pa. 23.

The title of this act is good: Com. v. Kebort, 212 Pa. 289; Kelley v. Mayberry Twp., 154 Pa. 440; Com. v. Jones, 4 Pa. Superior Ct. 362.

This act is a valid exercise of the police power: Sinking Fund Cases, 99 U. S. 700; Mugler v. Kansas, 123 U. S. 623 (8 Sup. Ct. Repr. 273); Sharpless v. Philadelphia, 21 Pa. 147; Com. v. McCloskey, 2 Rawle, 369; Com. v. McWilliams, 11 Pa. 61; Com. v. Moir, 199 Pa. 534.

The legislature can forbid the sale of anything which is or may be deleterious to health: Portland v. Meyer, 32 Ore. 368 (52 Pac. Repr. 21); N. Y. Health Department v. Trinity Church, 145 N. Y. 32 (39 N. E. Repr. 833); Welch v. Swasey, 193 Mass. 364 (79 N. E. Repr. 745).

*Frank P. Prichard,* with him *Thomas E. Lannen,* for appellee.—It is submitted that not only does the title of the act not clearly indicate that the legislature was intending to legislate on the subject of adulteration of confectionery, but that the title is distinctly misleading, in view of the previous legislation: Union Pass. Ry. Co.'s App., 81* Pa. 91; Provident Life & Trust Co. v. Hammond, 230 Pa. 407; Connolly v. Pipe Co., 184 U. S. 540 (22 Sup. Ct. Repr. 431); Com. v. Zacharias, 3 Pa. Superior Ct. 264.

OPINION BY HENDERSON, J., March 1, 1912:

The defendant was convicted on the first and second counts of an indictment which charged him with selling

confectionery which contained sulphur dioxide, in violation of the Act of May 13, 1909, P. L. 520. This act is entitled, "An Act relating to food; defining food; providing for the protection of the public health and the prevention of fraud and deception by prohibiting the manufacture or sale, the offering for sale or exposing for sale, or the having in possession with intent to sell of adulterated, misbranded or deleterious foods; prescribing certain duties for the Dairy and Food Commissioner in reference thereto; and providing penalties for the violation thereof." The indictment was drawn under the fifth paragraph of the third section of the act which declares that any article of food shall be deemed to be adulterated: "Fifth. If it contains any added sulphurous acid, sulphur dioxide or sulphites, benzoate acid or benzoates except as hereafter provided; or if it contains boric acid or borates, salicylic acid or salicylates, formaldehyde, hydrofluoric acid or fluorides, fluoborates, fluosilicates or other fluorine compounds, dulcin, glucin, saccharin, alum, compounds of copper, betanapthol, hydronapthol, abrastol, asaptol, oxides of nitrogen, nitrous acid or nitrites, pyroligneous acid, or other added ingredients deleterious to health; or if, in the case of confectionery, it contains any of the substances mentioned in this paragraph, or any mineral substance, or injurious color or flavor, alcoholic liquor, or any other ingredient, not herein mentioned, deleterious to health: . . . . And provided further that in the preparation of dried fruits and molasses, sulphur dioxide, either free or in simple combination may be used in such quantities as will not render said dried fruits or molasses deleterious to health." On motion of the defendant the learned judge of the quarter sessions arrested the judgment for the reason that the evidence did not show that sulphur dioxide had been "added" to the confections sold by the defendant and from the opinion filed the learned judge seems to have entertained the view that the act was unconstitutional as applied to confectionery which did not contain "added" dioxide of sulphur or other adulterant.

The first objection raised by the defendant was that the title to the act is defective in that confectionery is not specified as one of the subjects legislated about. This implies that confectionery is not food and such is the contention of the appellee. The act not only relates to food but the title indicates that the intention was to define what food is. That the legislature may define the terms it uses and the meaning which it attaches to words cannot be doubted. Where the meaning given in the act is not that which attaches to them in the common understanding the title of an act should express such exceptional meaning with sufficient clearness to excite inquiry as to the provisions of the act and this was evidently in the legislative mind when the title to the act was framed. Notice is given in the title of the intention to define the term "food." The title to the act to which Com. v. Kebort, 212 Pa. 289, related was different in form and contained no notice of the definition of the term "food" set forth in the body of the statute. That case is not an authority, therefore, in support of the appellee's position even if a definition of the word were necessary as applied to candy and other confectionery. It was held in Com. v. Kebort, that the term "food" did not include drink; that there was a generic distinction which had been recognized in the thought and speech of the race from time immemorial and that the word "food" did not include in the popular understanding drink also and that, therefore, liquors were not included in the prohibitions of the Act of June 26, 1895, P. L. 317. That the word "food" is a very general term and applies to all that is eaten for the nourishment of the body cannot be questioned. It is so understood generally and the authorities whose accuracy is relied upon in all departments of investigation concur in that definition: "Nutritive material absorbed or taken into the body for the purpose of growth or repair, or for the maintenance of the vital processes:" Webster. "That which is eaten or drunk for nourishment; aliment; nutriment, in the scientific sense. Any substance that,

being taken into the body of animal or plant, serves, through organic action, to build up normal structure or supply the waste of tissue; nutriment:" Standard Dictionary. "Whatever supplies nourishment to organic bodies; aliment; victuals; provisions:" Century Dictionary. It seems not a debatable question whether confections are within these definitions. No one could contend that sugar and honey are not food or that preserved fruits and chocolate are not nutriment and these constitute the great bulk of the confectionery manufactured and sold. The enormous consumption of the materials which enter into the composition of confectionery and the use which they have in the economy of nutrition are so well known that it is not necessary to enter into a discussion of their scientific value nor the relation which they bear to the food supply of the human race. That the term "food" includes candy, sweetmeats, preserves and other confectionery accords with the opinions of lexicographers, chemists and the popular understanding, but if this were not so, as the legislature might include confections in the catalogue of foods and has so done in this case and has given notice in the title of the act that it contained a definition of the things to which the statute applied, all interested are put on inquiry as to the matters therein contained and a title which leads to inquiry is sufficient in this respect. We need not refer to the numerous cases which hold that it is not necessary that all the distinct provisions of a statute be set forth in the title and that it is sufficient if that give notice of the subject of the act so as reasonably to lead to an inquiry as to what is contained in the body of the bill. Whatever the subject of a title reasonably suggests as appropriate to the accomplishment of the object declared is sufficiently indicated by such title. "Every possible presumption is in favor of the validity of a statute and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger:" Sinking Fund Cases,

99 U. S. 700; Powell v. Penna., 127 U. S. 678; Sugar Notch Borough, 192 Pa. 349.

The statute under consideration is a police regulation. It has to do with the public health which is one of the chief objects of government, and a proper subject of legislative control.   The power of the legislature to promote the general welfare is extensive and it may exercise a large discretion in determining how that power shall be employed.   What the interests of the public require and what measures are necessary to protect them are subjects for the exercise of this discretion.   Whether in a given instance the manufacture and sale of an article intended for human consumption is deleterious to health and whether the public welfare demands that such business be prohibited are questions of fact and policy exclusively for the determination of the legislature.   It is an elementary proposition that all property in this state is held under the implied obligation that the owner shall not use it to the injury of the community.   The legislature has declared that sulphur dioxide is deleterious to health and has forbidden its use in the manufacture of confectionery.   We must assume that this determination was reached after full examination and on reasonable grounds and that in the judgment of a body having control of the subject such prohibition was necessary to promote the public health.

It is contended, however, that the statute discriminates as to all other food except confectionery and in favor of dried fruits and molasses and that it violates sec. 3 of art. III of the constitution of Pennsylvania for that reason.   Whether these distinctions should have been incorporated in the statute was a legislative question.   It was clearly within the power of the legislature to prohibit the use of sulphur dioxide or any other poison in all of the articles entering into the food supply of the citizens of the commonwealth, and under the same power it might limit the prohibition to one class of food and not to another: Crowley v. Christensen, 137 U. S. 86; Davis v. Mass., 167 U. S. 43.   It is not necessary in the exercise of

the police power that legislation be directed against all subjects prejudicial to the public welfare. This statute might have operated only on confectionery or flour or sugar. At the same session of the legislature separate acts were passed with reference to fresh eggs, lard, ice cream and milk and cream, and numerous other similar statutes were enacted at other sessions of the legislature. The same discretion which permitted the enactment of a prohibitory law as to one article of food might exempt another from the prohibition. It is permissible to classify in such a case, reference being had to the character of the food, the form in which the adulterant is used and the extent to which the food is consumed. The legislature had these considerations in mind doubtless in the case of dried fruits and molasses. We cannot declare judicially that sulphur dioxide in the limited quantities permitted in the case of these two articles would affect the public health. Certain it is that they are not used to the extent to which confectionery preparations are used. No constitutional obligation rests on the legislature to subject every article of food to the same regulation. It is easy to conjecture reasons which may have led the legislature to place dried fruits and molasses in the same category and it is our duty to assume that some such consideration influenced that body. The fact, too, that it was provided that where sulphur dioxide in quantities not deleterious to health was used in the preparation of dried fruits and molasses notice that it had been so used must be plainly stated on each package suggests that the legislature recognized that sales of these articles are generally made to adults or persons able to understand the notice which the package must contain, whereas a very large proportion of the confectionery made in the country is sold to children who consume it without knowledge or discretion as to its constituents. And these considerations apply as well to the objection that the presence of sulphur dioxide in confectionery is forbidden, whereas in the case of other foods the "adding" of that substance is only prohibited. What

the legislative thought was in making this distinction is not expressed, but it is not difficult to see that it is based on substantial grounds. The evidence shows that gelatine is largely used in the manufacture of confectionery and that in the preparation of it large quantities of sulphur dioxide are used; that in much of the gelatine this chemical is not removed but remains in it when distributed by the manufacturers for consumption. This is doubtless the result of carelessness or cupidity and a condition difficult to guard against on the part of the health authorities. It is not shown that sulphur dioxide enters in any appreciable degree into the natural composition of other foods. It may have been as the result of accurate knowledge on the subject that added sulphur dioxide was prohibited in the one case, and whether "added" or not, in the other.

Objection is made to the enforcement of the statute because of that part of sec. 5 which provides: "But no prosecution shall be sustained, under the provisions of this act, against a retail dealer for the selling, offering for sale, exposing for sale, or having in possession with intent to sell, of any adulterated or misbranded article of food as defined herein, if the retail dealer from whom the said article of food, sample, or portion thereof, was obtained by the Dairy and Food Commissioner or his agent, can establish a guaranty, signed by the manufacturer or wholesale dealer, or jobber or distributor, residing in the United States, from whom such article of food was purchased or procured, to the effect that the same is not adulterated or misbranded within the meaning of this act designating it." This is said to be classification and discrimination. It will be observed, however, that it is not discrimination in favor of the sale of the adulterated products. The prohibition of them is general. It applies to all classes of dealers and declares the use of the poisonous ingredient to be unlawful. The reason for this exemption from prosecution is apparent. The transactions of manufacturers and wholesale dealers are with large quantities and

they have an opportunity to know the composition of their merchandise. The retail dealer who buys his stock in small quantities is in a very different situation. He has neither knowledge nor means of knowledge of the ingredients composing the article which he buys. He must rely in the first instance on the honesty of the wholesale dealer. Where he has a guaranty from such dealer as to the purity of the goods purchased there is a reason for protecting him from the penalty of a sale without notice of the character of the commodity. The classification between wholesale and retail dealers is a very obvious one and has been sustained in numerous cases. The act of April 22, 1846, P. L. 486, relating to tax on dealers in merchandise distinguished between those who sold goods of their own manufacture at their manufactories and those who sold other wares than those of their own manufacture. This act was considered in Norris v. Com., 27 Pa. 494. The act of May 2, 1899, P. L. 184, classified dealers into four classes and it was sustained in Knisely v. Cotterel, 196 Pa. 614, where the court said: "The division of vendors into wholesale and retail is perhaps the most obvious and familiar that could be made." "Classification is a legislative question subject to judicial revision only so far as to see that it is founded on real distinctions in the subjects classified, and not on artificial or irrelevant ones:" Seabolt v. Commissioners, 187 Pa. 318. This case involved the construction of the act of May 6, 1897, P. L. 46, classifying public bridges. The classification of telegraph companies was held valid in Western Union Tel. Co. v. Milling Co., 218 U. S. 406. Distinction between jobbers and wholesale dealers in cigarettes and between wholesale and retail dealers in leaf tobacco and liquors was sustained in Cook v. Marshall County, 196 U. S. 261. The same principle was applied in S. W. Oil Co. v. Texas, 217 U. S. 114, under a statute which provided for penalties for violation thereof. There is substantial ground, therefore, for the distinction made between wholesale and retail dealers as to the imposition of the penalty provided by the statute.

The fact is not to be overlooked, however, that the defendant is a wholesale dealer and as to that class of merchants the act is complete. The exception as to dried fruits and molasses and the exemption of retail dealers who sold ignorantly on a guaranty do not affect him. The broad terms of the act declare it to be unlawful to sell confectionery containing the prohibited adulteration. The legislature having power as we have seen to enact this prohibition the defendant is not relieved by the consideration that some other article of merchandise is not put in the same class or that retail dealers who sell on the representation of the wholesale dealer as to the purity of the goods are not to be visited with the penalties of the act for the first offense. The exceptions referred to are not of such import that without them the other sections of the act would cause results not contemplated or declared by the legislature: Hatch v. Reardon, 204 U. S. 152; Connolly v. Sewer Pipe Co., 184 U. S. 540. As affecting this case it is not important whether the sulphur dioxide was "added" to the candy as a separate constituent or was there because it was in one of the ingredients entering into the composition of the confectionery for under the first count of the indictment as we have seen a sale of the merchandise containing this ingredient is prohibited whether it be separately added or not and the conviction could be sustained on that count. We think the evidence warranted the submission of the case to the jury on the second count. It shows that sulphur dioxide is not a natural content of any of the material used in the manufacture of the confectionery. There was evidence, however, that traces of sulphur dioxide may appear in some natural food products because of sulphur existing therein which may account for such traces. This could be considered as having a natural origin and if it existed would not be "added" within the meaning of the act. It may be that minute quantities of other prohibited substances are naturally developed in other foods but this is not the condition to which the statute has reference. The purpose is clear. No one is permitted to take

sulphur dioxide and add it to a completed product or to put it into one constituent of a product and in combination with others make an article of food, with the exception of dried fruits and molasses. It is not disputed that sulphur dioxide may be combined with gelatine in the bleaching process and that is shown to be the manner in which it found its way into the goods of the defendant. It was added to the gelatine and the gelatine was combined with sugar and other constituents to compose the candy which the defendant sold. It would be too narrow a consideration of the act to hold that a prohibited element introduced into a manufactured product in the manner described by the commonwealth's witness was not added. It is not necessary for the commonwealth to show that the defendant knew that his merchandise contained the prohibited substance: Com. v. Farren, 91 Mass. 489; Powell v. Com., 114 Pa. 265. It may be as contended by the learned counsel for the appellee that the law bears heavily on a person so situated, but that is a result of the exercise of the police power in very many instances. From the necessity of the case special burdens are often borne for the general benefit. Regulations promoting the public welfare may press with greater weight on one than upon another, but the purpose is not to impose unequal or unnecessary restrictions upon one but to promote the general good: Barbier v. Connolly, 113 U. S. 27; Fischer v. St. Louis, 194 U. S. 361. It is not a relevant matter that in the opinion of the defendant or his witnesses the confections which he sold were wholesome and not deleterious to health. The quality of the particular merchandise does not affect the constitutionality of the act. Its object is the promotion of the public health by the method deemed best by the legislature. To decide that because some of the products affected by the statute were wholesome the law could not be enforced would undermine the police power of the state and overthrow every statute the wisdom of which would not bear judicial scrutiny: Powell v. Com., 114 Pa. 265; Powell v. Penna., 127 U. S. 678. No one pretends that sulphur di-

oxide is necessary or desirable in confectionery. The most that can be said is that in very small quantities it is not shown to be prejudicial. No one has a natural or a constitutional right to put poison in confectionery or other foods and the beneficial object of the statute under consideration ought not to be defeated except by clearly convincing reasons. We are not persuaded that any of the objections presented are sufficient to justify the conclusion that the act is unconstitutional.

The judgment is reversed and the record remitted to the court below to the end that sentence be imposed on the verdict in accordance with the law.