Jones, J.
 

 The provisions of the statute claimed to have been violated, Section 1089-9, General Code, are as follows:
 

 “For the purpose of this act a bottled soft drink, except pure nonalcoholic fruit juices, shall consist of a beverage made from pure cane or beet sugar syrup containing pure flavoring materials with or without added fruit acid, with or without added color, and shall contain in the finished product not less than 7 per cent, sugar, provided that nothing in this act shall prohibit the use of any other harmless ingredient in the manufacture of such soft drinks, but any substitute for sugar used in such manufacture shall be equal in sweetening power to 7 per cent, cane or beet sugar, and the use of saccharin is prohibited. And provided further that, whenever artificial coal-tar colors are used, nothing but the certified colors as approved by the federal government are permissible. The provisions of this section shall not apply to retailers who do not bottle soft drinks, except as to saccharin; and all bottled soft drinks not in compliance with the standards established by this act shall be deemed to be adulterated. All adultera
 
 *15
 
 tions of any of the drinks, extracts or other articles mentioned in this act shall be unlawful.”
 

 The evidence discloses that a state food inspector purchased a bottle of strawberry pop and submitted it for analysis to the state chemist at the state department of health. This bottle contained eight fluid ounces. The chemist testified that he found saccharin in the bottle, but did not determine its content or percentage. He merely found that saccharin was present. However, the defense placed tire manufacturer or bottler upon the stand, who testified that the eight-ounce bottle of pop contained 9 per cent, sugar content and one-sixth grain of saccharin. On the strength of this evidence, since the- statute prohibited the use of saccharin entirely, the magistrate felt that conviction should follow, even though the evidence disclosed that the quantity used was not deleterious to health.
 

 Upon the trial both parties introduced, without objection, certain regulations adopted by the state department of agriculture, as well as the finding and report of the National Eeferee Board of Consulting Scientific Experts. The defendant supplemented this report by testimony tending to show that the use of saccharin content, in the quantity found in the bottle, would not be detrimental to health.
 

 Section 1177-12, General Code, provides that the state secretary of agriculture shall establish standards of quality, purity, and strength of foods, when such standards are not otherwise established by state law, and that such standards shall conform to the standards for food adopted by the United
 
 *16
 
 States Department of Health. The section also requires the secretary to make uniform regulations for the enforcement of the state food and sanitary laws. Acting under this authority the department of agriculture promulgated regulations prohibiting the use of saccharin in soft drinks, holding it to be detrimental to health under the finding of the National Board of Review in its decision 135 made on April 29, 1911.
 

 This decision held that “if the use of saccharin be continued it is evident that amounts of saccharin may readily be consumed which will, through continued use, produce digestive disturbances.”
 

 The finding of the National Board of Review made on April 29, 1911, was to become effective on July 1 of that year; but later the time limit was extended until January 1, 1912.
 

 Decision 135 of the National Board of Review did not stipulate what amount of saccharin could be consumed, which, through continued usé, would produce digestive disturbances. Later, at the request of the United States Department of Agriculture, the National Referee Board was asked to give its opinion as to whether decision 135 was in harmony with its conclusion with reference to “the influence of saccharin on the nutrition and health of man.” On July 13, 1912, the National Referee Board of Consulting Scientific Experts presented its finding and report and held “upon what would seem to be convincing, experimental evidence, that small quantities of saccharin, up to 0.3 gram per day, are without deleterious or poisonous action, and are not injurious to health.”
 

 It further reported that “admitting that large
 
 *17
 
 quantities of saccharin — over 0.3 gram per clay— taken for long periods of- time may impair digestion, such evidence cannot consistently be accepted as an argument in favor of the view that smaller quantities must constitute a menace to health.”
 

 This report shows that, while the addition of saccharin to foods in small quantities does not affect the quality or strength of food, such statement is in harmony with the statements that:
 

 “The addition of saccharin to a. food as a substitute for cane sugar is a substitution involving a reduction in the food value of the sweetened product, and may thus result in a reduction in its quality,” and that “the
 
 substitution
 
 of saccharin for cane sugar, for example, in any food product, may result in a decided lowering of food value, and this must certainly be considered as an adulteration.”
 

 The report of the referee board on January 13, 1912, concludes with the following:
 

 “The possibility of substituting saccharin for ^ugar, thereby lowering the food value of the sweetened products, is a serious menace, and one that should be carefully safeguarded.”
 

 It appears from expert medical testimony that saccharin is equivalent to 400 or 500 parts of' sugar in sweetening power; that, if the ingredient is used generally and unrestrictedly as a sweetening agent, it might prove more or less harmful to certain classes of people, depending upon the state of health of the individual consumer. A witness employed in the bottling and manufactm'ing of this product was introduced by the defense, and testified that saccharin was used as a substi
 
 *18
 
 tute for sugar in the sense that it enhanced or brought out its flavor; that it enhanced the sugar taste. He testified that saccharin could be used as a substitute for sugar, although the employment of too great a quantity would embitter the taste.
 

 In view of the decision made by the National Referee Board in 1912, had the Legislature adopted a standard, fixing a content of saccharin in soft drinks which would not be consumed beyond the quantity of 0.3 gram per day, we would not be disposed to interfere with such legislative standard. However, the Legislature not only prohibited the use of saccharin in the manufacture of bottled soft drinks, but it is clear from the employment of the language used in the act that its prohibition was based upon the fact that this ingredient might be used as a substitute for sugar. If unrestrictedly used as such substitute, it might prove a serious menace to health, under the last decision of the National Referee Board. It is true that in the instant case the state did not prove that the one-sixth grain contained in the eight-ounce bottle of pop would be in any way deleterious to health. However, that does not meet the possibility that other manufacturers of soft drinks might use a much larger quantity of saccharin in their manufacture, or use it as a substitute for sugar because of its intensive sweetening power. We cannot inquire into the motive of the Legislature in prohibiting, and not regulating, the use of this ingredient. Whether because its continuous and unrestricted use would menace the public health, or because of the difficulty of in
 
 *19
 
 spection, or for the reason, that it might replace sugar* because of its sweetening power, we are unable to determine, but the fact remains that the Legislature unqualifiedly provided in the act that saccharin could not be used either as a substitute for sugar or otherwise.
 

 Counsel for plaintiff in error contend that the act is violative of the Fourteenth Amendment of the federal Constitution and especially that it deprives their client of liberty and property without due process, and that it denies him the equal protection of the law. That the state, acting within its police powers in the protection of the public health and safety, may regulate and even prohibit the use and sale of foods containing ingredients that may prove dangerous or deleterious to health is no longer an open question. The legal principle is also well established that the judiciary will not hold a statute constitutionally invalid unless there is a clear and palpable abuse of legislative power.
 

 In the case of
 
 Powell
 
 v.
 
 Commonwealth,
 
 114 Pa., 265, 7 A., 913, 60 Am. Rep., 350, a judgment was sustained for violation of a state act which prohibited the manufacture of oleomargarine or substance designed to take the place of butter or cheese produced from unadulterated milk or cream, or which was an imitation of either product. The following is found in the syllabus:
 

 “The fact that scientific experts may pronounce a manufactured article intended for human food to be wholesome and not injurious, and that in a pure state it may be thus good for food, does not render it incompetent for the Legislature to prohibit the manufacture and sale of the article if in the judgment of the Legislature, and not of
 
 *20
 
 the courts, it be necessary to the protection of the lives, health and property of the citizens, and to the preservation of good order and the public morals.”
 

 In the course of the opinion, at page 295 (7 A., 915), it was said:
 

 “The fact that the prohibited substances, in a pure state, may be wholesome and not injurious, is irrelevant in a judicial inquiry. Their wholesomeness will not render the act unconstitutional.”
 

 Substantially the same question arose in
 
 Commonwealth
 
 v.
 
 Kevin,
 
 202 Pa., 23, 51 A., 594, 90 Am. St. Rep., 613. There the prosecution was for the sale of one pint of raspberry syrup, containing an ingredient called salicylic acid, alleged to be poisonous and injurious to health. The act prohibited the sale, and defined food as adulterated, if it contained any added substance or ingredient poisonous or injurious to health, and, as in this case, counsel contended that the act was not violated, unless the quantity of the foreign substance was sufficient to make the compound poisonous or injurious to health. In the course of its opinion, page 29 (51 A., 596), the court said:
 

 “It is within the province of the General Assembly to determine whether the addition of a poisonous or injurious substance to a food article endangers the health of the citizens of the state who use the compound, and if it does, then it is clearly within the police power of the state to prohibit the manufacture and sale of the adulterated article as well as to protect the public from imposition or fraud in the sale of it.”
 

 The
 
 Powell case, supra,
 
 was later reviewed by the 'Supreme Court of the United States in
 
 Powell
 
 
 *21
 
 v.
 
 Pennsylvania,
 
 127 U. S., 678, 8 S. Ct., 992, 1257, 32 L. Ed., 253, Mr. Justice Harlan delivering the opinion. The profert made by the defendant was substantially similar to the evidence offered by defendant in the case at bar. In the course of ¿he opinion Mr. Justice Harlan said, pages 681 and 682 (8 S. Ct., 994), that the defendant offered to prove that the article there sold was made of pure animal fats, and its manufacture clean and wholesome; that the only effect of butterine was to give flavor to the butter, and that it had nothing to do Avith its wholesomeness; and “that the article sold to the prosecuting witness was a wholesome and nutritious article of food, in all respects as wholesome as butter produced from pure unadulterated milk or cream from unadulterated milk.” Further in his opinion, at pages 684 and 685 (8 S. Ct., 995), the justice says:
 

 “It will be observed that the offer in the court below was to show by proof that the particular articles the defendant sold, and those in his possession for sale, in violation of the statute, were, in fact, wholesome or nutritious articles of food. * * * Whether the manufacture of oleomargarine, or imitation butter, of the kind described in the statute, is, or may be, conducted in sucb a way, or Avith such skill and secrecy, as to baffle ordinary inspection, or whether it involves such danger to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit the manufacture and sale of árticles of that class that do not contain noxious ingredients, are questions of fact and of public policy which belong to the legislative de
 
 *22
 
 partment to determine. And as it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determination of those questions is conclusive upon the courts.”
 

 Substantially the same questions arose and similar principles were announced in the case of
 
 People
 
 v. Price, 257 Ill., 587, 101 N. E., 196, Ann. Cas., 1914A, 1154.
 

 It is also here contended that the act is discriminatory in that it seeks to prevent the use of saccharin in bottled soft. drinks only and that such prohibition is not confined to other soft drinks or food products in general daily use. While the act is questioned as to its application to soft drinks other than bottled, it evidently covers all soft drinks where saccharin is used. The department of agriculture has so construed it and issued its regulations accordingly, forbidding the use of saccharin in all food and drink products. We have no means of knowing why the Legislature confined this prohibition to such soft drinks. Undoubtedly it could have adopted a reasonable regulation in respect thereto, or extended the field of inquiry so as to cover other food or drink products. However, this is no argument against the utilization of the police power in respect to bottled soft drinks. The constitutional validity of the act cannot be attacked because its scope was not extended to cover the entire field of possible abuses.
 
 Yee Bow
 
 v.
 
 City of
 
 Cleveland, 99 Ohio St., 269, 124 N. E., 132, 12 A. L. R., 1424;
 
 Commonwealth
 
 v.
 
 Pflaum,
 
 236 Pa., 294, 299, 84 A., 842, Ann. Cas.,
 
 *23
 
 1913E, 1287;
 
 State
 
 v.
 
 Sherod,
 
 80 Minn., 446, 83 N. W., 417, 50 L. R. A., 660, 81 Am. St. Rep., 268.
 

 We are aware that the case of
 
 State
 
 v.
 
 Empire Bottling Co.,
 
 261 Mo., 300, 168 S. W., 1176, is not consistent with our view in respect to discrimination. However, no authority is cited in its support, save a former decision of the same court. As to this feature, the case of
 
 Hall, Supt. of Banks,
 
 v.
 
 Geiger-Jones Co.,
 
 242 U. S., 539, 37 S. Ct., 217, 61 L. Ed., 480, L. R. A., 1917F, 514, Ann. Cas., 1917C, 643, is in point. Quoting from a former decision of the federal court, Mr. Justice McKenna said, at pages 556 and 557 (37 S. Ct., 223):
 

 “A state ‘may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed. * * * If a class is deemed to present a conspicuous example of what the Legislature seeks to prevent, the Fourteenth Amendment allows it to be dealt with although otherwise and merely logically not distinguishable from others not embraced in the law.’ ”
 

 Since the Legislature may have considered that the use of saccharin as an ingredient in bottled soft drinks might be deleterious to health, or that it might be used as a substitute for sugar because of its intensive sweetening power, and since- no infringement of the fundamental law appears from the face of the statute, or from facts of which this court can take judicial cognizance, we are not inclined to encroach upon the legislative policy declared in the act prohibiting the use of saccharin in bottled soft drinks. We are of opinion that the
 
 *24
 
 act is constitutionally valid and within the inherent police powers of the state.
 

 The judgment of the Court of Appeals is affirmed.
 

 Judgment affirmed.
 

 Marshall, C. J., Matthias, Day, Allen, Kinkade and Robinson, JJ., concur.