## Commonwealth v. McDermott.

*Constitutional law—Regulation of solicitation for charities—Exemptions—Equality of opportunity—Act of May 13, 1925—State Constitution, art. i, sect. 1.*

1. The Act of May 13, 1925, P. L. 644, regulating the solicitation of money or property for charitable, religious or other benevolent purposes, is in conflict with the equality of opportunity in acquiring property guaranteed by article i, section 1, of the State Constitution, in that, by reason of the exemptions contained in section 11, it creates a discrimination between citizens without any just or reasonable ground to sustain the classification and amounts to an arbitrary denial to one person of rights which are given to another.

2. The whole act falls, as the exemption makes the act itself so uncertain in its application that it cannot be presumed that the legislature would have passed it without the exemptions.

Motions to quash indictments for unlawful sales, &c., of articles for charitable purposes without having obtained a license. M. C. Phila. Co. (Criminal Division), May Sess., 1927, No. 1186.

*T. M. Daly, Jr.,* for plaintiff; *William Berkowitz,* for defendants.

BONNIWELL, J., June 18, 1928.—Defendants were indicted for the sale of articles for charitable purposes without having obtained a license in compliance with the Act of May 13, 1925, P. L. 644, regulating the solicitation of money and property for charitable, religious or other benevolent purposes. Pleas of *nolle contendere* were entered, but these were subsequently withdrawn with leave of court, and motions to quash the indictments were substituted. Under these motions, the question of the constitutionality of the Act of 1925 was argued. It is conceded that McDermott, one of the defendants, had formed two organizations; one known as the Blue Ribbon Company, and the other as Babies' Milk Fund. The former handled grocery products

and made all the sales to the latter, which, in turn, sold them to the public by solicitation, in which it was stated that the profits derived therefrom would be devoted to the purchase of free milk for poor families. The milk fund paid the Blue Ribbon Company 50 per cent. of the gross receipts from sales, and, after deducting all expenses from the remaining 50 per cent., devoted the balance to charities. It appears that during a period of twenty-seven months the sum of $22,000 was collected from sales and only $862 of this amount used for the purchase of free milk.

The other defendants formed similar organizations, known respectively as the Philadelphia Standard Products Company and the Children's Welfare Society. The former supplied the products which were sold through the latter in the same manner as the Blue Ribbon Company sold to the Babies' Milk Fund. It is undisputed that between Jan. 1, 1927, and Feb. 26, 1927, the sum of $6575.07 was collected from proceeds of sales, of which amount only $343.62 was used for the purchase of free milk.

Defendants had made application for a certificate of registration under the Act of 1915, but the applications, after hearing, were refused by the Department of Welfare.

The principal objection to the constitutionality of the act is based on the exemption in section 11, in which it is provided: "This act shall not apply to fraternal organizations incorporated under the laws of the Commonwealth, religious organizations, colleges, schools, universities, labor unions, municipalities, or sub-divisions thereof, community organizations within the Commonwealth, nor to charitable institutions or agencies required by the provisions of existing law to file reports with the Department of Welfare or with any other department or office of the Commonwealth."

It is argued, first, that the act is unconstitutional, because the title does not refer to the exceptions mentioned in section 11, whereby certain organizations and institutions are exempt from its provision. The effect of this argument is not that the title is insufficient to cover the purpose of the act, but that it is broader than the terms of the act itself. The title purports to regulate the solicitation of money and property "for charitable, religious, benevolent, humane and patriotic purposes."

This brings within the scope of the act all individuals and organizations of every kind which attempt to raise money for the purposes stated. It is only when the body of the act itself is examined that it is discovered certain organizations are exempt. That this is not a fatal defect has been decided by our appellate courts in Snyder County *v.* Wagenseller, 262 Pa. 269; Cleary *v.* Quaker City Cab Co., 285 Pa. 241, and Com. *v.* Pflaum, 50 Pa. Superior Ct. 55.

A far more serious question arises when the exemptions provided in the act are considered with reference to the general purpose and object intended to be accomplished. The act is necessarily a police regulation passed for the protection of the general public from solicitation by unauthorized persons or by those who have in view the promotion of some object for private or personal gain, rather than the interests of the particular charity or object for which the money is ostensibly solicited. But in carrying out this purpose, it is necessary for the legislature to do so within certain rules prescribed by both the State and Federal Constitutions. The act, when carried out, must not deny to any person within its jurisdiction the equal protection of the laws, nor must it grant to any individual or body a special or exclusive privilege or immunity. Classification is proper, but even in the acts passed under the police power it must be controlled by the principle that the classification

is unconstitutional unless a necessity therefor exists, and that this necessity must be one springing from the manifest peculiarities of the case, clearly distinguishing those of one class from the other, and imperatively demanding legislation for each class separately that would be useless and detrimental to the others: Ayar's Appeal, 122 Pa. 266, 281; Com. v. Puder, 67 Pa. Superior Ct. 11, 16. Where proper subjects for classification exist, legislation for a class as distinguished from the general subject is not special, but general, and classification is a legislative question, subject, however, to judicial review, so far as to see that it is founded on real distinctions, not on artificial or irrelevant ones used for the purpose of evading the constitutional prohibition: Seabolt v. County Commissioners, 187 Pa. 318, 323; Com. v. Puder, 67 Pa. Superior Ct. 11, 18.

The act here involved purports to be a general one, applying to all individuals, associations or organizations who undertake by any means to solicit donations or subscriptions for any charitable or benevolent purpose. It is not until we come to section 11 that a doubt arises as to its constitutionality. This section limits the act by exempting from its provisions various organizations which would otherwise be within its express provisions. Some of the exemptions mentioned are definitely designated, such as colleges, universities, labor unions, etc., but this is not true of others. For instance, religious organizations are exempt, thus contradicting the provision of the title which makes the act apply to solicitations for religious purposes. Community organizations are also exempt without any definition to indicate just what is meant by community organization. The terms "religious" and "community" organization are broad enough to cover a multitude of organizations. Thus, in Craig v. First Presbyterian Church, 88 Pa. 42, it was held that Sunday school rooms and lecture-rooms were included within the definition of "religious purposes," notwithstanding they were frequently used for fairs and social gatherings, the Supreme Court saying (page 49): "Nor do we think it detracts from the character of the occupancy of the building, that it is proposed to use the lecture-room occasionally for social gatherings incident to the church, for societies for benevolent objects, and for fairs held by the ladies to raise funds for missionary work; nor that it is proposed to sometimes furnish a 'plain tea' to those members who attend evening service from a distance. The body needs food as well as the soul. If the church requires the building for its Sabbath schools and for a lecture-room, and such purposes are religious in their nature, as we have endeavored to show, of what possible matter can it be should the church utilize said building by applying it to other collateral objects, not in themselves technically religious, yet germane to the general purpose."

In Knight's Estate, 159 Pa. 500, a corporation formed for the purpose of "uniting persons so as to be incorporated socially for the improvement of their intellectual and moral condition, by the dissemination of scientific truths by means of literature, music, lecture and debate," was for a religious purpose. The Supreme Court said, by Mr. Justice Williams (page 502): "In its broadest sense, religion comprehends all systems of belief in the existence of beings superior to, and capable of exercising an influence for good or evil upon, the human race; and all forms of worship or service intended to influence or give honor to such superior powers. It is in this sense of the word that we speak of the religion of the North American Indians, the religion of the fire worshipers, or the ancient Egyptians. A bequest in aid of any such system would, therefore, be a bequest for a religious use within the meaning of the act."

In Hebrew Free School Ass'n v. New York, 4 Hun (N. Y.), 446, 449, it was held that a religious society was not limited to societies organized as incorporated churches, but includes those whose objects are of a benevolent, charitable or missionary character, as distinguished from private and sectarian institutions. These decisions are referred to here merely for the purpose of pointing out the difficulty of defining and carrying into effect the provisions of the Act of 1925, and of determining to what particular organization it should or should not apply. While it may be contended that this question is practically one to be decided in each case by the Department of Welfare, to which department the act delegates a certain discretion in the granting or refusal of certificates, it has a far more important bearing on the question of the constitutionality of the act, which cannot be overlooked by the courts.

The act can be sustained, if at all, only on the ground that it is an exercise of the police power of the State. Assuming that the subject for the exercise of the power was a proper one, it must be exercised in such manner as not to amount to a discrimination between persons equally qualified to come within its provisions, giving exemption to one and not to another. In other words, whether or not there is a real distinction between a religious organization, for example, and another organization not purporting to be a religious one, but interested in the same general subjects.

The basis of the act in question is protection to the public from fraudulent solicitation for funds under the guise of aiding a charity. The purpose is a laudable one and should be encouraged. But that purpose must be accomplished, if at all, in a proper manner consistent with constitutional rights. The operation of the act, as drawn, may be illustrated by assuming the existence of two bodies of reputable citizens undertaking to aid some worthy benevolent or charitable purpose. The one body claims no religious affiliation in connection with the enterprise, while the other decides to operate under the auspices of some existing or newly-created religious organization. The act would apply to the one and not to the other, though the need for protection to the public, and, therefore, the excuse for interference by the legislature, will be the same in each case. Let us assume, further, that one of the bodies above referred to happened to be composed of individuals whose real purpose was to create personal profits under the guise of a worthy charitable object. Would it not be possible to evade the law by operating under the guise of religion in any of its many forms?

The same result would appear in applying the exception of "community organizations." One body of citizens, in their endeavor to promote a worthy object, would be subjected to the penalties of the act, while another body would be exempt therefrom merely because they took the precaution to first form a "community" club or organization. Whether they did or did not do so would not have the slightest bearing on the proportion of the fund raised which would ultimately go to the beneficiary thereof. Likewise, evilly-disposed persons would readily evade the law by operating as a community enterprise, while those most able and willing to give aid would be excluded until they had duly procured a license under the act. We think the result is clearly a discrimination between citizens without any just and reasonable grounds to sustain the classification.

In the case of Com. v. Zacharias, 181 Pa. 126, it was held that while the general provisions of the Act of June 16, 1891, P. L. 313, relating to the conduct of retail drug business, was within the proper exercise of the police power, an exception in the act discriminating in favor of the administrator or widow of a deceased pharmacist would make the act unconstitutional.

Commonwealth *v.* McDermott.

This question was not necessary to the decision of the case, but in the course of the opinion by Mr. Justice Williams it was said (page 130) : "The requirement that one conducting such a trade should have such chemical and pharmaceutical knowledge as to qualify him to handle intelligently the dangerous commodities in which he deals is reasonable. It can be supported without regard to the exception, which is a repeal *pro tanto* of the prohibition which it was the purpose of the statute to make. The exception makes a discrimination between equally unqualified parties, giving to one exemption from the operation of a rule enforced against the other. This is not protection to the public, but rank injustice to individuals. There is no more reason why the administrator or widow of a pharmacist should be permitted to manage a business of which he or she knows nothing than why any other administrator or widow should be allowed to do so. If the reason of the exception is sympathy for a widow, then all widows are *prima facie* equally entitled to sympathy and have the same reason to claim exemption from the operation of the law. The exception would seem to fall squarely under the rule laid down in Sayre Borough *v.* Phillips, 148 Pa. 482. It is a discrimination made between those who are equal under the law. It is an arbitrary gift to one, and an arbitrary denial to another, which cannot be upheld."

In the opinion of the same case in the Superior Court will be found the following relevant language (3 Pa. Superior Ct. 264, 271) : "Could it be successfully contended that the Act of 1891 would be constitutional if this provision were a little broader in its scope, and should except from its provisions all persons who were widows in the Commonwealth of Pennsylvania? Is it any less unconstitutional because it exempts from its provisions the widows of a certain class of people?   Or would it not be clearly unconstitutional if the act provided that all legal representatives of deceased persons should have the right to carry on such business and should be exempted from the provisions of the Act of 1891? Is it not just as unconstitutional to say that such business may be carried on indefinitely by the legal representatives of a certain class of individuals in the Commonwealth of Pennsylvania, even though such deceased persons may have been, during their lifetime, competent pharmacists? We fail to see the distinction, and regard the act as being as unconstitutional in the one instance as it would be in the other."

In Sayre Borough *v.* Phillips, 148 Pa. 482, a local ordinance, in regulating the business of peddling, but exempting residents of the borough from its provision, was held invalid. The Supreme Court said (page 489) :

"So long, however, as it bears upon all persons impartially, it may fairly claim to be a police regulation intended to destroy a business that was regarded as injurious; but at the end of the prohibiting section of the ordinance a proviso may be found which exempts all residents of the Borough of Sayre from its operation. The proviso converts the police regulation into a trade regulation. The ordinance, taken as a whole, does not prohibit an injurious business, but injurious competition.

"That the resident dealer and peddler may enjoy a larger trade, the nonresident peddler is shut out. If the borough authorities may lawfully regulate the business of peddling for the benefit of residents, we see no reason why they may not lay their hands in like manner on every department of trade and of professional labor, and protect the village lawyer and doctor as well as the village grocer and peddler."

In Chalmers *v.* Philadelphia, 250 Pa. 251, a classification which distinguished between engineers who operated boilers of more than ten-horse power and those who operated smaller ones was held improper on the ground that

no greater skill or judgment was required in one case than the other, and the classification was not based on any real distinction. In Com. v. Casey, 231 Pa. 170, an act regulating the hours of mechanics and distinguishing between those employed by municipal corporations engaged in public work and those employed in other similar work for private employers was improper because there was no real distinction between the number of hours employed in the work of the same character, whether for an individual or a public corporation, and it was, therefore, not a police but a trade regulation. In the opinion of the court (page 256) it was said: "Even though the subject of the legislation is such that separate laws for separate classes are demanded, if the class to which it applies is unnecessarily restricted or improperly selected, still the law is special, since a more enlarged class or other objects similar in character should also have had the benefit of its remedial force." See, also, Com. v. Clark, 14 Pa. Superior Ct. 435, where similar legislation distinguishing between one who worked for an individual and one who worked for a corporation was condemned.

In Com. v. Humphrey, 288 Pa. 280, it was held that the Act of May 25, 1921, P. L. 1131, was unconstitutional because it exempted from its operation officers and directors of a corporation engaged in interstate commerce, the Supreme Court saying, by Chief Justice Moschzisker (page 289): "What reasonable grounds can there be for permitting officers and employees of corporations engaged in interstate commerce to practice the profession of engineering in Pennsylvania without registration, while requiring all officers and engineers of corporations not engaged in interstate commerce to be registered?"

We are of the opinion that, while the act in question contains a proper subject-matter of police regulation, the exemptions provided in section 11 make it operate to discriminate unequally between those who are equal under the law. It amounts to an arbitrary denial to one person of rights which are given to another, thus interfering with the personal rights and liberties of the individual, as guaranteed by the State and Federal Constitutions, without such justification for the classification adopted for the protection and welfare of the public. We can think of no protection which the public might require from solicitation in the name of charity which it would not equally require if the same solicitation and for the same purpose be made in the name of religion. It is a matter of history that frauds have been perpetrated from earliest times by evilly-disposed persons in the name of religion. This may be accounted for by the fact that it affords a ready cloak for hypocrisy. "Fraud, in its nature, eludes the light and walks in ambushes and deceits:" By Coulter, J., in Kinzer v. Mitchell, 8 Pa. 64, 80. As a subject-matter of police regulation, therefore, we are unable to see how a class line can be drawn on religious grounds.

The question remains as to whether the whole act must fall, or whether a part of it can be eliminated and the rest enforced. The difficulty with the latter course is that the exemption makes the act itself so uncertain in its application that we cannot presume the legislature would have passed the act without the exemption. It is useless to speculate as to what the legislature might have done. This question was discussed in Com. v. Humphrey, supra, and we cannot do better than quote the following extract from the opinion of the Chief Justice (page 290): "The law is that, wherever part of an act found to be unconstitutional can be severed from the rest of the statute without destroying its entirety of thought, such severance may be made and the act sustained, but where the severance would destroy the

unity of thought, the whole act necessarily falls. This rule is expressed in Rothermel v. Meyerle, 136 Pa. 250, 265, as follows: 'If the part which is unconstitutional in its operation is independent of, and readily separable from, that which is constitutional, so the latter may stand by itself, as the reasonable and proper expression of the legislative will, it may be sustained as such; but if the part which is void is vital to the whole, or the other provisions are so dependent upon it and so connected with it that it may be presumed the legislature would not have passed one without the other, the whole statute is void.' See, also, Booth & Flinn v. Miller, 237 Pa. 297, 309. We cannot presume that the legislature would have passed the present act without the exemption contained in paragraph (g) of section 24, any more than we are waranted in thinking it would have passed the act, even though all the numerous exemptions inserted therein had been omitted; hence, we must assume these exemptions to be inseparable expressions of the legislative will, and as one, at least, of them is unconstitutional, the whole act falls."

In the present case the act was aimed against those organizations, individuals and groups of individuals who do not come within the exemptions, and it is in the application of the act to them that the discrimination heretofore discussed results. If this discrimination results in arbitrarily denying to one citizen or group of citizens rights which are given to another, the whole act is necessarily void.

The motions to quash the indictments are sustained.